**Rexford MURPHY and Debbie Fields Murphy, parents and next friends of Christopher Carl Murphy, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–882V.

United States Claims Court.

Aug. 9, 1991.

Robert T. Moxley, Gage and Moxley, Cheyenne, Wyo., for petitioners.

Mary Hampton Mason, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

NETTESHEIM, Judge.

This case is before the court on petitioners' motion for review of a special master's dismissal of their petition for compensation brought under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1—300aa–34 (1988), *as amended* by several public laws codified in 42 U.S.C.A. §§ 300aa–1—300aa–34 (West Supp.1991) ("the Act"). The issues upon review are whether the special master's denial of petitioners' motion for an evidentiary hearing, his interpretation of what constitutes "significant aggravation" of a seizure disorder, and his findings were arbitrary and capricious. Argument is deemed unnecessary.

## FACTS

The following facts found by the special master or in the record before the special master are not contested, unless otherwise noted. Christopher Carl Murphy was born on August 28, 1976, in Pitt County Memorial Hospital ("Pitt Memorial"), Greenville, North Carolina, to Rexford and Debbie Fields Murphy ("petitioners"). Although Mrs. Murphy experienced vaginal bleeding, as well as the threat of premature labor in her sixth month of pregnancy, Christopher was pronounced a healthy baby upon delivery, weighing 8 pounds, 5 ounces, with APGAR scores of 9 and 10. Christopher's head size at birth was 36 centimeters ("cm."), which placed him in the 85th percentile for newborn males.

On September 16, 1976, Christopher received his first well-baby checkup. The doctor noted that his head size had increased to 39 cm., which placed Christopher in the 97th percentile for males. In her supplemental affidavit dated March 27, 1991, Mrs. Murphy revealed that the doctor discussed the possibility of hydrocephalus or other neurological problems with her on this occasion. Supplemental Affidavit of Debbie Fields Murphy, Mar. 27, 1991, ¶ 4.

Christopher returned to the doctor for a checkup on October 11, 1976. His head had grown to 41 cm., an abnormally large size. The doctor again raised the possibility of neurological problems. He also noted two white ash leaf-shaped spots on Christopher's chest, suggesting that they might be symptoms of a very rare disease. Christopher received his first DPT shot during this visit.

In her March 27, 1991 supplemental affidavit, Mrs. Murphy avers the following series of events after the vaccination:

Within eight hours of his first DPT shot Christopher began to have three symptoms of a reaction to the vaccine, unusual high pitched shrill screaming of hours' duration, periods where he would go completely limp for a few seconds (symptoms of encephalopathy) and infantile spasms (seizures). He began having episodes of prolonged unusual high pitched screaming. He was stiff as a board with his legs straight out and stiff and NOTHING could be done to console him. He acted as if he was totally unaware that we were trying to console

him or were even there. The second kind of spell also started within eight hours and it was particularly noticeable as not being normal behavior in an infant when he was sitting in his infant seat. He would have clusters or series of jerking spells in which his arms would fly up and his legs out, almost identical to the infant shown in the Great Britain video on Tuberous Sclerosis having infantile spasms in series. Sometimes he would give a little cry after each jerk and/or a tear would run down his cheek, and the interval between spasms would be 10 to 50 seconds. They were not precipitated by unexpected loud noises or stimulation. Sometimes his eyes would roll to the side or back during a spasm. If you were holding him in a sitting position he would suddenly fall forward with great force over and· over in series.

Suppl. Murphy Aff. ¶ 7 (emphasis in original). Although Mrs. Murphy submitted a 1978 calendar and a handwritten diary recording significant events in Christopher's early years, her calendar and diary entries did not note this information. Mrs. Murphy claims that she discussed these episodes with doctors by telephone, but no medical reports were submitted that verified these conversations.

Mrs. Murphy, however, did take Christopher to the emergency room at Pitt Memorial on October 18, 1976, after a three-hour crying spell that was followed by high-pitched shrill crying and screaming for about an hour.[1] The examining doctor suspected that gas pains were the cause of the spells and found him to be normal in other respects. Mrs. Murphy noted the "piercing screaming for [an] hour" in her diary for October 18, 1976.

Christopher received his second DPT shot on November 11, 1976. During the visit, his head size measured 43 cm. The only comment noted by the doctor was Christopher's decreased irritability after administration of the second vaccine. Mrs. Murphy claims that "Chris's screaming and jerking spells (infantile spasms) immediate-

ly worsened, dramatically, and he could not go to sleep because the jerking spells kept waking him up every time he would doze off." Suppl.Murphy Aff. ¶ 12. Mrs. Murphy did not record this reaction in her diary.

On November 27, 1976, Christopher experienced his first documented seizure. At this time he was admitted to Pitt Memorial and diagnosed as having a seizure disorder. The hospital records note his background as "essentially benign" with the exception of his large head. There were no notations of any prior seizures. In addition, the result of an electroencephalogram ("EEG") test indicated an abnormal pattern consistent with a seizure disorder.

Christopher's third DPT was administered on December 13, 1976. At this time his head size measured 44.5 cm., which is highly abnormal. Christopher was treated with phenobarbital at that time and the doctor reported that he had experienced no seizures. Although Mrs. Murphy's diary did not reflect this information, her supplemental affidavit stated that "after the third DPT, Chris within eight hours showed a return of his seizures, worse than before...." Suppl.Murphy Aff. ¶ 16. Approximately one month later, on January 13, 1977, Christopher was admitted to Pitt Memorial as a result of his seizures. An additional medicine was prescribed, and he was released the following day.

Christopher received his fourth DPT on March 14, 1978. No medical records document an increase of seizure activity on this date. Mrs. Murphy in her diary noted that the vaccination was administered, but did not mention any change in his condition. She did, however, record a "fever" on March 15, 1978, and "screaming" on March 16, 1978, on a monthly calendar. Mrs. Murphy's supplemental affidavit states that seizure activity increased dramatically following the vaccination. Suppl.Murphy Aff. ¶ 27.

On March 30, 1978, Christopher was readmitted to Pitt Memorial because "he was either in an almost constant staring spell

---

1. Mrs. Murphy's supplemental affidavit states, "[Christopher] had a spell of high pitched shrill

screaming of three hours duration...." Suppl.Murphy Aff. ¶ 8.

with head-drop type of seizures or having grand mal seizures of long duration." Suppl.Murphy Aff. ¶ 28. During this hospitalization Christopher was diagnosed with tuberous sclerosis. At the present time Christopher is severely mentally retarded and developmentally slow, although he has not suffered seizures since 1985.[2]

On September 5, 1990, petitioners filed for compensation on behalf of their minor son Christopher. Following the status conference mandated by RUSCC Appendix J, (Vaccine) Rule 5, the special master issued an order allowing petitioners to file additional doctors' expert statements. Although respondent objected, petitioners' reports were filed on March 6, 1991. On March 11, 1991, the special master issued a memorandum advising counsel that it was "inclined to rule against the petitioners." *Murphy v. Secretary of HHS*, No. 90–882V, Memorandum of Status Conference, at 1 (Cl.Ct.Spec.Master Mar. 11, 1991). Over respondent's objections, the special master also allowed petitioners to submit Mrs. Murphy's diary.

On March 29, 1991, petitioners submitted the diary and calendar, in addition to other affidavits. Petitioners also filed a motion for an evidentiary hearing, which was denied on April 19, 1991. Special Master Paul T. Baird issued his decision on April 25, 1991, denying compensation under the Act. *Murphy v. Secretary of HHS*, No. 90–882V, slip op. at 11, 1991 WL 74931 (Cl.Ct.Spec.Master Apr. 25, 1991).

Petitioners filed on April 29, 1991, a request for reconsideration of the decision without a hearing. The special master denied the request on May 1, 1991. On May 3, 1991, petitioners moved for leave to file a necessary record document, which was denied as moot. On May 24, 1991, petitioners filed a motion in the Claims Court to review the special master's April 25, 1991 decision.

### DISCUSSION

#### 1. *Standard of review*

■ On review of a decision by a special master, the Claims Court is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law." 42 U.S.C.A. § 300aa–12(e)(2)(B). The Federal Circuit recently affirmed that "this standard of review applies to all cases filed after the effective date of the [1989] amendment ...," *Hines v. Secretary of HHS*, 940 F.2d 1518, 1523 (Fed.Cir.1991), including the case at bar. The issue of whether the evidence of record warrants a conclusion that a vaccine caused an injury calls for review under the arbitrary and capricious standard. *Id.* at 1527. According to the Federal Circuit, " '[A]rbitrary and capricious' is a highly deferential standard of review...." *Id.* at 1528.

The Supreme Court, in the context of reviewing a federal agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706 (1988), explained that under the arbitrary and capricious standard a reviewing court must consider "whether the [federal agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (citing cases) (quoted in *Hines*, at 1527). "Although ... [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one...." *Citizens To Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824; *see also Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir.1990) (the "touchstone" of arbitrary, capricious, and abuse of discretion standard of review is rationality—consideration of all relevant factors absent a clear error of judgment). In *Hines* the Federal Circuit charted the course for a special master's review: 1) considering the relevant evidence in the record as a whole; 2) drawing plausible inferences from the evidence; and 3) artic-

---

**2.** Mrs. Murphy's supplemental affidavit describes, and the records show, the entire medical course of Christopher's illness. Only the events that could possibly be related to the administration of the vaccine are related herein.

ulating a basis for decision that is rational. *Hines*, at 1527–28.

### 2. *Denial of evidentiary hearing*

■ Petitioners argue that the special master arbitrarily and capriciously denied an evidentiary hearing and by doing so prevented them from a fair adjudication of their claim.

Overall, the Vaccine Rules accord the special master extensive discretion in conducting proceedings. Vaccine Rule 3(b) provides:

> The special master shall be responsible for conducting all proceedings.... The special master shall determine the nature of the proceedings, with the goal of making the proceedings expeditious, flexible, and less adversarial, while at the same time affording each party a full and fair opportunity to present its case and creating a record sufficient to allow review of the special master's decision.

Vaccine Rule 8(b) directs the special master to "consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties...."

Both the statutory and case law instruct that the special master is not required to conduct an evidentiary hearing. The Act obligates the special master to afford all interested persons an opportunity to submit relevant written information. 42 U.S.C.A. § 300aa–12(d)(3)(B)(iv). The rules of procedure should "include the opportunity for parties to submit arguments and evidence on the record without requiring routine use of oral presentations, cross-examinations, or hearings." 42 U.S.C.A. § 300aa–12(d)(2)(D). Implementing these statutory directives, Vaccine Rule 8(a) directs the special master after consultation with the parties in each case "based on the special circumstances thereof, ... [to] de-termine the format for taking evidence and having argument...." Rule 8(d) states: "The special master may decide a case on the basis of written filings without an evidentiary hearing...."[3] The Claims Court in *Hale v. Secretary of HHS*, 22 Cl.Ct. 403 (1991), reinforced the special master's discretion to grant or deny an evidentiary hearing. "When all material facts are developed in the motion papers, a full trial is useless. 'Useless' in this context means that more evidence than is already available ... could not reasonably be expected to change the result." 22 Cl.Ct. at 408; *see Hines*, 940 F.2d at 1525–1526 (since proceedings under the Act are informal and standards of admissibility are flexible and informal, "fundamental fairness" does not require opportunity to object to medical textbook before special master used it).

Not only did the special master have the power to deny an evidentiary hearing, but the record reveals that he did not act in an arbitrary or capricious manner in doing so. The special master granted petitioners' repeated requests to add evidence. Following the initial status conference on January 8, 1991, he granted petitioners leave on January 9, 1991, to submit additional statements from experts. After the special master's March 11, 1991 memorandum expressed the inclination to find against petitioners, petitioners were allowed additional time to file Mrs. Murphy's diary. When petitioners submitted, in addition to the diary, a supplemental affidavit of Mrs. Murphy, three other affidavits, and a calendar, the special master accepted the additional filings. The special master observed:

> The record comprises a detailed, 15–page factual affidavit of the mother as well as affidavits from the father and other fact witnesses; the mother's diary, calendar,

**3.** Vaccine Rule 8(d) provides in full:
The special master may decide a case on the basis of written filings without an evidentiary hearing. In addition, the special master may decide a case on summary judgment, adopting procedures set forth in RUSCC 56 modified to the needs of the case.
In his April 19, 1991 order denying petitioners' motion for an evidentiary hearing, the special master stated that "a case need not meet the summary judgment criteria to be decided on the written filings...." He decided the case "based on the authority of the first sentence ..., not the second." *Murphy v. Secretary of HHS*, No. 90–882V, at 2 n. 2, 1991 WL 71500 (Cl.Ct.Spec. Master Apr. 19, 1991).

and other notes; complete medical records; and reports and curriculum vitaes from expert medical witnesses for each of the parties. The record as it now stands is more than sufficient to enable the special master to reach a fair, reasoned, and informed decision on the petition. After thoroughly reviewing the written record, the court is persuaded that there is nothing which could be testified to at an evidentiary hearing which would affect the outcome of the case. *Murphy v. Secretary of HHS*, No. 90–882V, at 2–3, 1991 WL 71500. The special master could reasonably conclude that "there is nothing which could be testified to at an evidentiary hearing which would affect the outcome of the case." *Id.* at 3.[4]

### 3. The special master's interpretation of "significant aggravation"

Petitioners assert that administration of the DPT vaccine triggered the advancement of tuberous sclerosis in Christopher and therefore significantly aggravated his prior condition.

a. The Act provides coverage for significant aggravation of a seizure disorder. 42 U.S.C.A. § 300aa–13(a)(1) provides, as a general rule:

Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness ... is due to factors unrelated to the administration of the vaccine described in the petition. . . .

42 U.S.C.A. § 300aa–11(c)(1)(C)(i) addresses "significant aggravation" insofar as a petition for compensation under the Act must contain materials demonstrating that the injured person had "significantly aggravated" a condition listed in the Vaccine Injury Table, § 300aa–14(a), one of which is a seizure disorder. The Act's definition of "significant aggravation" and the statutory time period allotted for that aggravation to occur are straightforward. Section 300aa–33(4) defines significant aggravation as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." The legislative history attempts to clarify this definition:

The Committee has included significant aggravation in the Table in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be described as pre-existing (e.g., a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), but is meant to encompass serious deterioration (e.g., a child with monthly seizures who, after vaccination, has seizures on a daily basis). The Committee also intends that the time periods set forth in the Table apply to the significant aggravation in order for causation to be deemed to exist (e.g., a significant deterioration of a seizure disorder after [DPT] vaccination must first become manifest within three days of the vaccination).

H.R.Rep. No. 908, 99th Cong., 2d Sess. 15, 16, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6356–57 [hereinafter "House Report"].

---

4. In his April 19, 1991 order denying petitioners' motion for an evidentiary hearing, the special master states: "With some 4000 petitions pending and severe time constraints in effect for deciding them, holding an unnecessary hearing does more than just waste time and money. It seriously prejudices the other petitioners waiting in line." Order of Apr. 19, 1991, at 2 n. 3. Petitioners argue that the special master denied the hearing as a matter of expediency and there-

fore that they were denied due process. The quoted language shows that the special master had determined that a hearing was unnecessary in the first instance. The Act grants him that discretion; indeed, the Act manifests a preference for alternatives to trial-type proceedings in resolving contested claims. The special master's elaboration on the current caseload and time constraints was not the reason for his decision not to hold a hearing.

42 U.S.C.A. § 300aa–13(b)(2) establishes that significant aggravation must occur within three days of administration of a vaccine:

> The special master or court may find the first symptom or manifestation of onset or significant aggravation of any injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did in fact occur within the time period described in the Vaccine Injury Table.

b. The special master interpreted the language to mean that an award based on a finding of significant aggravation must stem 1) from evidence of aggravation of the disorder within three days following administration of the vaccine [5] and 2) from "a thorough review and analysis of the injured person's condition before and after the vaccination in question, including consideration of what changes could reasonably have been expected in the course of the condition in the absence of any aggravation." *Murphy*, slip op. at 3 (citations omitted).

■ The special master's interpretation is consistent with the plain meaning of the statute. It appears that Congress permitted compensation of injuries that were aggravated significantly by the vaccine so that those with prior injuries would not be excluded. Whether a prior illness or injury was aggravated or a new illness brought on, the illness must have manifested itself within the stipulated time period in order for the child to qualify for compensation.[6] When there are signs of aggravation within the stipulated period, it then must be determined whether those reactions were actually the result of the vaccine or simply a progressive symptom of the prior illness coincidentally arising in that particular period.

### 4. Findings on proof of Table injury and significant aggravation

Petitioners argue that the special master's denial of a hearing thwarted their proofs. The special master adhered to the standards set forth in the Act. Petitioners filed for compensation claiming that Christopher suffered from encephalopathy and seizures, a Table injury. The Vaccine Injury Table sets forth "the time period in which the first symptom or manifestation of onset or of the significant aggravation of such injuries, disabilities, illnesses, conditions, and deaths is to occur after vaccine administration for purposes of receiving compensation under the Program." 42

---

**5.** Petitioners attempt to distort the meaning of the last passage of the legislative history by deleting the final parenthetical phrase of the passage. Petitioners claim that the special master "missed the import of the last part of the quoted passage" by failing to consider "the possibility of significant aggravation outside of 'Table time.'" Pets' Br. filed May 24, 1991, at 12, 13. The deleted language establishes that the significant aggravation must occur within the stipulated time period.

**6.** On review petitioners ask that the record be reopened to examine evidence that would distinguish between seizures caused by tuberous sclerosis and those that occur as a result of a DPT vaccination. The record shows that Christopher's illness had manifested itself prior to the vaccinations. First, Christopher's head size was exceptionally large immediately after birth, and the doctors discussed with Mrs. Murphy the

possibility of neurological problems on two occasions prior to the first vaccination. Second, before the first vaccination was administered, the doctor noted white ash-leaf spots on his chest. Mrs. Murphy averred that these spots had been "very noticeable since about one week and were getting more noticeable all the time." Suppl.Murphy Aff. ¶ 6. The special master remarked that Christopher's clinical case has been fully consistent with a diagnosis of tuberous sclerosis and found a preponderance of evidence that Christopher's present condition is a natural result of tuberous sclerosis. The record before the special master was adequate to support his finding, to the extent that it was necessary to identify a preexisting condition. Even if the special master erred on this issue, petitioners still failed to prove the requisite significant aggravation within the three-day timeframe.

U.S.C.A. § 300aa–14(a).[7] For petitioners to be compensated, they must prove that the "first symptom or manifestation of onset or of the significant aggravation after vaccine administration" occurred within three days. *Id.*

The special master described a reasonable standard for weighing medical records and personal accounts:

> It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight. *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 [68 S.Ct. 525, 542, 92 L.Ed. 746] (1947); *Montgomery Coca–Cola Bottling Co. v. United States*, [222 Ct.Cl. 356] 615 F.2d 1318, 1328 (Ct.Cl.1980); *see also* 32A C.J.S. *Evidence* § 1033 (1964). That rule has been followed in Program cases. *See, e.g., Flynn v. Secretary of HHS*, No. 89–54V, slip op. at 7 (Cl.Ct. Spec.Mstr. May 17, 1990). The rule should not be applied blindly, however. Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent. Records which are incomplete may be entitled to less weight than records which are complete. If a record was prepared by a disinterested person who later acknowledged that the entry was incorrect in some respect, the later correction must be taken into account. Further, it must be recognized that the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance. Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant. *See Clark v. Secretary of HHS*, No. 90–45V, slip op. at 3, 1991

WL 57051 (Cl.Ct.Spec.Mstr. March 28, 1991).

*Murphy*, slip op. at 6. As the special master noted, "[t]he medical records in this case are complete and are essentially consistent with one another...." *Id.* The medical records identify the onset of Christopher's seizures at three months of age.

The special master reviewed the medical records; they did not indicate that Christopher suffered any reaction to a DPT shot within three days following its administration. Christopher received his first vaccine on October 11, 1976; his second on November 11, 1976; and his third on December 13, 1976. Although the medical records address Christopher's condition, there is no record that his problems manifested themselves within the three-day period. Petitioners do not challenge the special master's findings as to the dates of the vaccinations or those of subsequent hospital visits.

The Act allows petitioners compensation for an injury even if "a symptom or manifestation of ... [the] illness ... was not recorded or was incorrectly recorded as having occurred outside such period." 42 U.S.C.A. § 300aa–13(b)(2). Petitioners must demonstrate, however, "by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did in fact occur within the time period described in the Vaccine Injury Table." *Id.* Therefore, even though the medical records do not support petitioners' claim, petitioners may come within the Act's coverage if they demonstrate by a preponderance of the evidence that an injury or manifestation occurred within three days of administration of the vaccine. The special master ultimately found that "[t]here is no reasonable basis here for implicating the DPT vaccine ... in Christopher's seizure disorder, his mental retarda-

7. Congress determined the time periods during which manifestations of a reaction to a vaccination must occur in order for a petitioner to be compensated upon a "review of all relevant medical and scientific information" conducted by the Secretary of Health and Human Services. National Commission To Prevent Infant Mortality Act of 1986, Pub.L. No. 99–660, § 2133, 100 Stat. 3743, 3752, 3779. By linking the relationship between an illness and the vaccination, Congress established "the time periods within which the first symptom or manifestation of onset or aggravation of each such illness or condition can reasonably be determined to occur after pertussis vaccination." 100 Stat. at 3780.

tion or his developmental delays." *Murphy*, slip op. at 10.

The special master determined that the statements submitted by Mrs. Murphy were unsubstantiated. In her March 27, 1991 supplemental affidavit, she describes Christopher's adverse reactions to each of the vaccinations as occurring within a three-day period. Nonetheless, the special master concluded that there was not a preponderance of evidence that these reactions occurred when she averred. Vickie Whaley Bright's affidavit, also dated March 27, 1991, states that "Debbie has always been meticulous in keeping notes and records and journals of events she deemed important...." Affidavit of Vickie Whaley Bright, Mar. 27, 1991, ¶ 2. Although Mrs. Murphy's diary recorded "piercing screaming for [an] hour" on October 18, 1976, and the occurrence of a "grand mal seizure" on November 27, 1976, she did not make similar entries regarding any reactions on any of the three dates following each vaccination. As the special master pointed out, Mrs. Murphy completed a questionnaire on April 25, 1983, revealing that Christopher had begun having seizures at the age of 12 weeks and that he had experienced " 'no reaction' to any of his DPT shots." *Murphy*, slip op. at 7–8. In addition, none of the affidavits submitted by petitioners, other than Mrs. Murphy's, pinpoints the onset of the seizures as within the critical three-day period. Mrs. Murphy, a licensed practical nurse, did not note in her diary the reactions and timing to which she recently attested, nor did she seek medical treatment for Christopher at the time his reactions allegedly occurred, as she did with the November 27, 1976 seizure.

■■■ The special master declined to credit Mrs. Murphy's most recent factual statement. He did not act arbitrarily or capriciously in doing so. The special master evaluated the evidence of record in tracking Christopher's clinical course, with attention to evidence other than the medical records. His ultimate findings that the evidence did not preponderate that Christopher suffered an encephalopathy or the onset or aggravation of a seizure within three days following any of the DPT vaccinations or that Christopher's present condition could be linked causally to the DPT vaccine administrations were not arbitrary or capricious. The special master's methodical and thorough analysis of the record belies petitioners' contention that a hearing would have developed any more cogent information.[8]

Finally, the court recognizes the underlying principle of the Act as set forth in the House of Representatives Report: "The Federal government has the responsibility to ensure ... that all children who are injured by vaccines have access to sufficient compensation for their injuries." House Report at 5, 1986 U.S.Code Cong. & Admin.News at 6346. Congress, however, stipulated the qualifications for compensation under the Act, thereby demarcating those persons deemed injured by vaccines and those persons deemed not injured by

---

**8.** Petitioners criticize the special master for his failure to mention the Occupational Therapy Evaluation, or developmental analysis, performed by occupational therapist Doris J. Shriver, claiming that her report is conclusive evidence of aggravation of Christopher's condition following administration of the vaccine. Pets' Br. filed May 24, 1991, at 10. Ms. Shriver's analysis tracks a series of developmental problems suffered by Christopher following each vaccine administration, but the validity of those findings is questionable. Christopher was born on August 28, 1976. This evaluation was conducted on February 26, 1991. Ms. Shriver based her findings on medical records, photographs, and an interview with Mrs. Murphy. In addition, Ms. Shriver admits that developmental "milestones were generally accomplished" after the first vaccination. Ms. Shriver's report does not maintain that Christopher's problems would not have occurred if the vaccinations had not been administered. She simply relates developmental problems to the dates of the vaccinations. Most significantly, she does not attempt to supply the three-day temporal linkage between vaccination and symptoms, concluding that "the correlation of DPT immunizations to developmental delays [is] obvious in this case." The special master is not required to discuss every item of evidence when his decision reflects that he fully considered a party's position and arguments on point. Even if the special master erred, the error was harmless, given the abundant evidence inconsistent with a finding that administration of the vaccine caused significant aggravation within three days. *See Hines*, 940 F.2d at 1527–28.

vaccines.[9] Sympathy is extended to those parents, such as petitioners, with children suffering grievously, but whom Congress chose to exclude from the Act's coverage. In concluding that petitioners failed to meet their burden of proof, the special master's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## CONCLUSION

Accordingly, based on the foregoing, the decision of the special master is sustained. The Clerk of the Court shall enter judgment accordingly.

No costs on review.

---

**9.** All other arguments made by petitioners that are not discussed specifically have been considered carefully and found to be without merit.