Mark and Rebecca LANKFORD, as legal representatives of the Estate of Justin Travis Lankford, Petitioners,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–2941 V.

United States Court of Federal Claims.

Dec. 3, 1996.

Reissued for Publication April 15, 1997.*

Larry D. Ashworth, Nashville, TN, for petitioners.

Vincent Matanoski, U.S. Department of Justice, Washington, D.C., for respondent.

ORDER AFFIRMING DECISION
OF SPECIAL MASTER

WIESE, Judge.

This case comes before the court on petitioners' appeal of a decision by the special master, entered July 24, 1996, denying compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa–

---

* This Order was originally entered by the court on December 3, 1996, as an unpublished ruling. This reissuance as a published order follows in response to Respondent's Request for Publication filed March 3, 1997.

1 to 34 *et seq.* (1994) ("Vaccine Act") for an alleged vaccine-caused encephalopathy that culminated in the death of Justin Travis Lankford, petitioners' infant son, less than twenty-four hours after his receipt of a diphtheria, pertussis, tetanus (DPT) inoculation.

The special master's decision denying compensation rested on essentially two grounds. First, that petitioners' recollection of Justin's reaction to the DPT vaccine, as recounted in their trial testimony, described a more acute clinical response than the contemporary evidence would suggest actually had been the case. Second, that even if one were to accept, at face value, petitioners' testimony regarding Justin's post-vaccinal symptoms, that evidence, properly assessed, would not support the finding of a reduced level of consciousness indicative of an encephalopathy.

Petitioners challenge both branches of the decision on grounds of arbitrariness. They ask that we vacate the decision and enter our own findings in their favor or, alternatively, remand the matter to the special master for further consideration. Respondent opposes petitioners' motion and asks that the decision be affirmed. The parties have briefed the issues and oral argument was heard on November 21, 1996. At the conclusion of the argument, the court announced its decision in respondent's favor. We restate here the basis for our ruling.

## I

### The Background Facts:

Justin Lankford received his first DPT vaccine in the mid-morning of February 24, 1987. According to petitioners' testimony, Justin cried vigorously at the time of the injection. However, the crying lasted only a few minutes. Then, in the hours that followed, Justin developed a fever that reached 101.5° Fahrenheit and his behavior became quite subdued. Specifically, his appetite diminished, he slept more than usual—drifting back and forth between sleep and wakefulness—and he was difficult to arouse. The testimony also brought out that, in addition to lacking his usual vigor, Justin's coloring paled, his eyes became dull, and he seemed tired.

Early in the afternoon of the same day, Justin's mother telephoned the pediatrician's office to ask whether, in light of Justin's state of health, it would be prudent to permit Justin to accompany her while she completed several errands by automobile. Although this telephone conversation included mention of Justin's physical condition, the concern that chiefly prompted the mother's call was the localized swelling that had appeared at the injection site. As she put it: "my concern then was the knot that was on his leg from the injection shot."

In response to her inquiry, Justin's mother was told that the symptoms she had described were not unusual and, provided Justin's temperature did not rise above 103° Fahrenheit, would not preclude his being taken along in the automobile while she performed her tasks. Based on this advice, Justin and his mother completed several errands together, including a visit to her place of employment (to obtain certain tax forms), a visit to Mr. Lankford's place of employment (to provide him a ride home) and, in the early evening,—now accompanied by Mr. Lankford—a stop-over at a local restaurant for an evening meal.

The evening hours saw little change in Justin's condition. He continued to drift into periods of sleep and he remained generally unresponsive to his surroundings. He was placed in his crib around one o'clock in the morning and, when last checked—roughly one hour later—was asleep, lying in the same position in which his father had placed him. At six o'clock that same morning, Justin was found dead in his crib.

The emergency center treatment record (at the hospital to which Justin was taken) reflects Justin's receipt of a DPT vaccine on February 24, 1987, describes his condition as being "O.K." at 2:00 A.M., and ascribes his death to unknown causes, i.e., it is recorded as a SIDS (sudden infant death syndrome) death.

### The Medical Experts' Opinions:

The facts recounted above provided the basis for the opinion testimony of the two medical experts who appeared in this case to offer their assessments concerning the likeli-

hood that Justin had suffered a vaccine-related encephalopathy that led to his death. The first expert, Dr. Marcel Kinsbourne, a pediatric neurologist testifying on behalf of petitioners, expressed the opinion that Justin's clinical signs—notably, the increase in sleep, the inactivity and unresponsiveness while awake, the limpness in body tone and the loss of color—were suggestive of a lowered level of consciousness indicative of an encephalopathic process.

Important to this diagnosis was Dr. Kinsbourne's belief that drowsiness of the sort manifested by Justin is typically associated with children whose reaction to a DPT vaccine includes extensive crying. Their drowsiness, in other words, is usually brought on by fatigue. Since Justin, however, had cried for only a short while, it was Dr. Kinsbourne's opinion that Justin's drowsiness was symptomatic of injury, *i.e.*, was indicative of a reduced level of consciousness resulting from an encephalopathy. Thus, Justin's clinical signs, when taken together with the death that followed shortly after their onset, led Dr. Kinsbourne to conclude that it was more likely than not that Justin's death was a complication or a sequela of an encephalopathy resulting from the DPT vaccine.

A contrary diagnosis was offered by respondent's expert, Dr. John Malmstrom, a specialist in child neurology. Dr. Malmstrom's opinion was that Justin's clinical manifestations, while clearly relatable to the administration of the DPT vaccine, were, at the same time, no more pronounced in severity than the adverse systemic reactions typically encountered in the administration of that vaccine. Significantly, Dr. Malmstrom disagreed with Dr. Kinsbourne's premise that Justin's drowsiness should be differentiated from the ordinary case because it was not associated with a period of prolonged crying. Dr. Malmstrom's testimony brought out that uncharacteristic crying occurred in only 5 percent of the cases involving DPT reactions while drowsiness occurred in 58 percent of such cases. In other words, drowsiness appeared more commonly without prolonged crying.

## II

As noted at the outset, the special master saw this case as involving the resolution of two basic issues. First, determining the probative worth of petitioners' testimony, given not only the special difficulties inherent in the accurate recall and description of clinical details that had taken place many years earlier, but also the possibility of a psychological impediment to objectivity flowing from their personal involvement in the tragedy being recounted. Second, determining which of two opposing expert opinions, each reflecting the judgment of a well-qualified medical specialist, offered the more probable explanation of the cause of Justin's death. Petitioners seek our review of the special master's disposition of both of these issues.[1] However, as we see this case, a disposition in respondent's favor may rest on the second ground alone. We limit our discussion accordingly.

The special master, it will be recalled, ruled that even if petitioners' testimony were taken at face value, that testimony could not support a finding that Justin had suffered an encephalopathy. To put it more accurately, it was Dr. Kinsbourne's diagnosis of encephalopathy, based on the petitioners' testimony, that the special master found wanting. The special master explained his rejection of Dr. Kinsbourne's opinion thusly:

> Dr. Malmstrom cited evidence showing that certain of Justin's symptoms, upon which Dr. Kinsbourne relied, are extremely common non-encephalopathic reactions to DPT inoculations, specifically noting that approximately 58% of DPT vaccinees experience drowsiness and 31 % diminished appetite.
>
> I found this testimony by Dr. Malmstrom to be more persuasive than that of Dr. Kinsbourne. I note, for example, one particularly telling exchange in which Dr. Kinsbourne was asked how he could con-

---

1. The special master's opinion applies his disposition of these two issues to both the petitioners' claim of a presumed vaccine-caused injury and death, *i.e.*, a Table Injury, and to their separate claim. of an actual vaccine-caused injury, *i.e.*, causation in-fact. Since this distinction is not important to the issues on appeal, it has not been carried forward in petitioners' motion for review.

clude that Justin's reduced level of activity constituted an actual depression of consciousness rather than mere drowsiness. Dr. Kinsbourne replied that he believes that post-DPT drowsiness is usually simply a result of a period of intense crying; in this case, he explained. he found that Justin's inactivity could not be explained as typical post-DPT drowsiness, since it was not preceded by a long period of crying. Respondent's counsel then pointed out, however, that contrary to Dr. Kinsbourne's assumption, the evidence indicates that drowsiness is a symptom that occurs in DPT recipients independently from, and much more after than, periods of intense or unusual crying.

*Lankford v. Secretary of Dep't of Health and Human Servs.*, No. 90–2941V, slip op. at 8 (Fed.Cl.Sp.Mstr. July 24, 1996).

In short, Dr. Kinsbourne's conclusion that Justin's drowsiness was uncommon in origin (*i.e.,* not related to crying) and thus indicative of injury (*i.e.,* an encephalopathy) rested on a factual premise that did not correspond with medical experience. Accordingly, the special master's rejection of petitioners' position can hardly be considered arbitrary: "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

■ Petitioners maintain, however, that even if one accepts the position that Justin did not exhibit an encephalopathic response to the DPT vaccine, nevertheless his symptoms were not ordinary in the manner described by Dr. Malmstrom—they did not resolve themselves without consequence. Rather, from those symptoms a death ensued. Thus, the fact that a death occurred, petitioners now say, "precludes one from logically determining, or assuming in any fashion, that the reactions which were present in this case were in fact less serious." Accordingly, petitioners argue, it was arbitrary for the special master to accept Dr. Malmstrom's

assessment of Justin's reaction as the more trustworthy diagnosis.

Although we are sympathetic to this argument, we cannot endorse it. Under the Vaccine Act, death is recognized to be a compensable Table Injury when medically identified as an "acute complication or sequela" of an encephalopathy (or other listed Table Injury). 42 U.S.C.A. § 300aa–14(a)(I)(E) (West Supp.1995). Thus, a finding of encephalopathy must precede the death.

Petitioners' argument seeks to reverse this cause and effect relationship. Petitioners would have the court conclude that because a death occurred, it would be more logical to assume that the adverse clinical signs that preceded that event bespoke an encephalopathic process rather than simple drowsiness. The argument is not acceptable because—as we have already said—it reverses the analytical discipline demanded by the statute: a medically justified determination of encephalopathy must precede the occurrence of death. The necessity for such a prior determination is evident even in the analysis pursued by petitioners' own expert.

Petitioners insist that the argument they are urging here parallels the reasoning adopted in *Jay v. Secretary of Dep't of Health & Human Servs.*, 998 F.2d 979 (Fed. Cir.1993). Again, the court disagrees. Leaving details aside, the holding of that case is simply that a special master is not free to disregard testimony asserting that a vaccine-caused encephalopathy occurred where that testimony (i) is presented by a qualified medical specialist, (ii) reflects a reasoned evaluation of undisputed facts, and (iii) stands uncontradicted by any opposing medical opinion. Plainly, these evidentiary qualifications are not present in this case. The *Jay* decision is not applicable here.

### III

■ The Vaccine Act does not give this court a free hand to rewrite a special master's decision according to its own independent evaluation of the evidence. Rather, we are obliged by the terms of the Act to accord finality to the special master's decision unless that decision is "found to be arbitrary, capri-

cious, an abuse of discretion or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). Under this standard, a decision that reflects a reasoned evaluation of the evidence and that is otherwise free of legal error cannot be overturned. *Murphy v. Secretary of Dep't of Health & Human Servs.*, 23 Cl.Ct. 726, 729 (1991). We have such a decision here. The special master confronted the task of choosing between two competing expert opinions by articulating a reasoned basis—drawn from the evidence—for preferring one over the other. No more can be demanded. The special master's decision must be affirmed.