# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 09-0080V
### Filed: October 28, 2013
### Reissued for Redaction: November 19, 2013

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
G.L.G., a minor,                          *
by his parents and natural guardians,     *
ERNEST GRAVES and                         *
CHERYL W. GRAVES,                         *
                                          *        Autism; Statute of Limitations;
                    Petitioners,          *        Untimely Filing
        v.                                *
                                          *
SECRETARY OF HEALTH                       *
AND HUMAN SERVICES,                       *
                                          *
                    Respondent.           *
                                          *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

Ernest Graves and Cheryl W. Graves, Yulee, FL, *pro se* petitioners.
Ryan Pyles, Esq., U.S. Dept. of Justice, Washington, DC, for respondent.

## DECISION[1]

**Vowell,** Chief Special Master:

On February 11, 2009, petitioners filed a claim for compensation pursuant to the National Vaccine Injury Compensation Program ["Vaccine Program" or "the Program"][2] on behalf of their son, G.L.G. Petitioners filed the short-form petition authorized by Autism General Order #1,[3] thereby joining the Omnibus Autism Proceeding ["OAP"].[4]

---

[1] When this decision was originally issued, the parties were notified that the decision would be posted in accordance with the E–Government Act of 2002, Pub. L. No. 107–347, 116 Stat. 2899, 2913 (Dec. 17, 2002). The parties were also notified that they may seek redaction pursuant to 42 U.S.C. § 300aa–12(d)(4)(B); Vaccine Rule 18(b). Petitioners made a timely request for redaction and this decision is being reissued with the name of the minor child redacted to initials and the child's birthdate redacted to the year only. Except for those changes and this footnote, no other substantive changes have been made.

[2] The National Vaccine Injury Compensation Program ["Vaccine Program" or "the Program"] is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. § 300aa-10 et seq. (2006) ["Vaccine Act" or "the Act"]. All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

[3] Autism General Order #1 adopted the Master Autism Petition for Vaccine Compensation for use by petitioners filing claims intended to be part of the OAP. By electing to file a Short-Form Autism Petition for

# I. Procedural History.

While causation hearings in the OAP test cases were held and entitlement decisions were issued,[5] petitioners were ordered to file all medical records and a "Statement Regarding Onset." *See* Order, issued Mar. 4, 2009, at 7-8. Respondent was ordered to file a statement, indicating whether the claim should continue in the OAP. *Id.* at 8.

On April 21, 2009, petitioners filed some medical records and a second petition signed by *pro se* petitioner, Cheryl Graves. *See* Petitioners' Exhibits ["Pet. Exs."] 1-10; Petitioners' Second Petition ["Pet. Second Petition"]. In response to petitioners' filings, respondent filed a statement indicating that, based on the record to date, she "cannot determine whether petitioners have established . . . that [their] claim was filed within the statutorily prescribed limitations period set forth in Section 16(a) of the [Vaccine Act]." Respondent's Statement, filed Jun. 29, 2009, at 1.

Following resolution of the OAP test cases,[6] petitioners were ordered to inform the court whether they wished to proceed with this claim or exit the Vaccine Program.

---

Vaccine Compensation petitioners alleged that:

> [a]s a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder, consisting of an Autism Spectrum Disorder or a similar disorder. This disorder was caused by a measles-mumps-rubella (MMR) vaccination; by the "thimerosal" ingredient in certain Diphtheria-Tetanus-Pertussis (DTP), Diphtheria-Tetanus-acellular Pertussis (DTaP), Hepatitis B, and Hemophilus Influenza Type B (HIB) vaccinations; or by some combination of the two.

Autism General Order # 1. The text of Autism General Order #1 can be found at http://www.uscfc.gov/sites/default/files/autism/Autism. ["Autism Gen. Order # 1"], 2002 WL 31696785 (Fed.Cl.Spec.Mstr. July 3, 2002).

[4] A detailed discussion of the OAP can be found at *Dwyer v. Sec'y, HHS.,* No. 03-1202V, 2010 WL 892250, at *3 (Fed. Cl. Spec. Mstr. Mar. 12, 2010). By design, the evidence produced by the parties in the OAP is available for use by either party in any other OAP case. *Dwyer*, 2010 WL 892250, at *2.

[5] The Petitioners' Steering Committee ["PSC"], an organization formed by attorneys representing petitioners in the OAP, litigated six test cases presenting two different theories on the causation of Autism Spectrum Disorders ["ASDs"].

[6] The Theory 1 cases are *Cedillo v. Sec'y, HHS.*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 89 Fed. Cl. 158 (2009), aff'd, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. Sec'y, HHS.*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 88 Fed. Cl. 473 (2009), aff'd, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. Sec'y, HHS.*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 88 Fed. Cl. 706 (2009). Petitioners in Snyder did not appeal the decision of the U.S. Court of Federal Claims. The Theory 2 cases are *Dwyer*, 2010 WL 892250; *King v. Sec'y, HHS.*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *Mead v. Sec'y, HHS.*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010). The petitioners in each of the three Theory 2 cases chose not to appeal.

*See* Order, issued Sept. 14, 2010, at 2-3.  Petitioners indicated they wished to continue with their claim.[7]  *See* Petitioners' Response, filed Oct. 14, 2010.

On February 24, 2011, petitioners were ordered to provide a statement explaining how the vaccines G.L.G. received caused his injuries and were warned that their claim may not have been timely filed.  *See* Order at 1-2.  In response, Cheryl Graves filed a statement, alleging that the combination of vaccines G.L.G. received on October 14, 2004, when he was sick with cold symptoms caused his autism and epilepsy.  Petitioners' Theory of Causation ["Pet. Theory"], filed Mar. 24, 2011, at 1.

The case was reassigned to me on August 15, 2012.  On September 26, 2012, I held a digitally-recorded telephonic status conference to discuss the next steps in this case.  Ryan Pyles appeared on behalf of the respondent, and pro se petitioner, Cheryl Graves, was present on the call.  During the call, Ms. Graves informed me she had encountered difficulty obtaining G.L.G.'s medical records.  I ordered petitioners to file a list of all medical facilities visited so that subpoenas might be prepared to obtain any missing medical records.  Order, filed Sept. 27, 2012, at 2.  I ordered respondent to issue subpoenas and to collect and file all medical records within 60 days of the filing of petitioners' list.  *Id.*

On October 31, 2012 petitioners filed a list of all medical facilities, and I thereafter ordered respondent to issue subpoenas for each medical facility on petitioners' list.  *See* Orders filed Nov. 7, 2012.  Respondent filed all medical records by February 7, 2013.  *See* Respondent's Exhibits ["Res. Exs."] A-G.

After examining the medical records filed, I determined that petitioners had not demonstrated by preponderant evidence that the case was timely filed or that circumstances warranting equitable tolling existed.  I ordered petitioners to show cause why I should not dismiss their petition as untimely filed.  *See* Show Cause Order, issued June 20, 2013, at 6; § 16(a)(2) (the Vaccine Act's statute of limitations).

On July 16, 2013, Ms. Graves filed petitioners' response, arguing that her earlier statements regarding the timing of G.L.G.'s speech delay were wrong and G.L.G.'s speech delay did not occur until later than she originally indicated.  Petitioners' Response to Show Cause Order ["Pet. Response to SC Order"] at 1-2.  Ms. Graves further asserted that the requirement of G.L.G.'s pediatrician, Dr. Marrero, that she get Medicaid "could be considered a form of 'duress.'"  *Id.* at 1.

I ordered respondent to file a reply.  On August 20, 2013, respondent filed a motion to dismiss and evidence from the OAP regarding the occurrence of the first symptom of autism.  *See* Res. Exs. H-L.[8]  Respondent argued that the medical records

---

[7] Like the statement filed on April 21, 2009, this statement was not signed by both petitioners but only by G.L.G.'s mother, Cheryl Graves.  In her response to my June 20, 2013 Show Cause Order, Ms. Graves explained that G.L.G.'s father, Ernest Graves often did not sign the documents she filed because he was traveling and that she and he divorced on May 17, 2011.  Response, filed July 16, 2013, at 2.

[8] At one point in her motion to dismiss, respondent erroneously referred to these exhibits as Res. Exs. A-

established that G.L.G.'s symptoms occurred prior to February 11, 2006, that the Federal Circuit's decision in *Cloer*[9] rejected a discovery rule approach to the statute of limitations, that doctrine of equitable tolling should not be applied to this case based on the duress referred to by Ms. Graves. Respondent's Motion to Dismiss ["Res. Motion to Dismiss"] at 2-3. Respondent noted that the OAP evidence (Res. Exs. H-L) indicated that in most children, the first symptoms of autism occur by 24 months of age, supporting the histories Ms. Graves provided in G.L.G.'s medical records. *Id.* at 4.

I grant respondent's motion to dismiss as I find the petition was not filed prior to the expiration of the Vaccine Act's statute of limitations, and petitioners have not established an adequate basis for applying the doctrine of equitable tolling to G.L.G.'s case.

## II. Statute of Limitations.

The Vaccine Act provides that in the case of:

> a vaccine set forth in the Vaccine Injury Table which is administered after October 1, 1988, if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the **expiration of 36 months** after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury . . . .

§ 16(a)(2) (emphasis added). In *Cloer*, the Court of Appeals for the Federal Circuit affirmed that the statute of limitations begins to run on "the date of occurrence of the first symptom or manifestation of onset of the vaccine-related injury recognized as such by the medical profession at large." *Cloer,* 654 F.3d at 1325. The Federal Circuit explained that this date is "a statutory date that does not depend on when a petitioner knew or reasonably should have known anything adverse about her condition." *Id.* at 1339. The date is dependent on when the first sign or symptom of injury appears, not when a petitioner discovers a causal relationship between the vaccine and the injury. *Id.*

Although the Federal Circuit held that doctrine of equitable tolling applies to Vaccine Act claims, the Federal Circuit explained that it is only available in "extraordinary circumstances," such as when a petitioner is the victim of fraud or duress. *Cloer,* 654 F.3d at 1344-45 (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). In the *Cloer* case the petitioner did not know of a causal link between her injury and vaccination until 2004, but the Federal Circuit declined to apply equitable tolling. 654 F.3d at 1344-45. The Federal Circuit specifically held "that equitable tolling under the

---

E but clearly labeled and filed them as Res. Exs. H-L.

[9] *Cloer v. Sec'y, HHS*, 654 F.3d 1322 (Fed. Cir. 2011).

4

Vaccine Act due to unawareness of a causal link between an injury and administration of a vaccine is unavailable." *Id.* at 1345.

### III. First Symptom or Manifestation of Onset of G.L.G.'s Autism.

To be timely filed under the Vaccine Act's statute of limitations, this claim must have been filed within 36 months from the date of the occurrence of "the first symptom or manifestation of onset or of the significant aggravation" of G.L.G.'s autism. § 16(a)(2). Since the petition was filed on February 11, 2009, the claim is untimely filed if G.L.G.'s first symptom of autism occurred prior to February 11, 2006.

A. G.L.G.'s Medical Records.

G.L.G. was born in 2003. Pet. Ex. 1, p. 1 The medical records reflect both well and sick child visits in his first two years of life. Pet. Ex. 2, p. 6. He received routine childhood vaccinations at his well child check-ups from two months to 18 months. Pet. Exs. 4, pp. 4-5, 14, 15, 17; 8, p. 2. His last recorded vaccinations were received on October 14, 2004. Pet. Exs. 4, p. 17; 8, p. 2.

Other than poor weight gain, the medical records from G.L.G.'s eighteen month well child check-up on October 14, 2004, and his two year well child check-up on July 16, 2005, indicate only mild problems with G.L.G.'s development. At his eighteen month well child check-up, G.L.G. had a cold, was teething, was "not eating the past few weeks," and had a history of bronchiolitis with sleep apnea in the past month. Pet. Ex. 4, p. 17. Under growth and development, G.L.G. was noted to use "mature jargoning," to have a vocabulary of six words, to run, and to follow direction. *Id.* Only "[p]oints to five body parts" and "kicks [a] ball" were not circled, indicating that these skills had not been acquired. *Id.* On the record from his two year well child check-up in July, 2005, when he was 28 months old. G.L.G. was noted to use two word phrases, have a vocabulary of 50 words, kick a ball, put on clothes, name pictures, and jump. Pet. Ex. 4, p. 22. The only skill not circled was use of "indiscriminate pronouns." *Id.*

Apparently, after his two year well child check-up, G.L.G. was not seen by a medical professional until more than a year later for a well child check-up on October 26, 2006.[10] Pet. Ex. 4, p. 25. G.L.G. was 44 months of age at this visit. The record of this visit reflects that G.L.G. was developmentally delayed, especially in speech.

The filed medical records do not contain concurrently recorded information regarding his development from 28 to 44 months of age. However, a number of later entries involving G.L.G.'s medical history as provided by Ms. Graves indicate that she observed symptoms of autism between two and three years of age.

---

[10] During the September 26, 2012 telephonic status conference, Ms. Graves informed me that G.L.G.'s gap in medical care was due to a period of time during which she was attempting to qualify for Medicaid but was denied coverage.

The first of these entries was made on May 9, 2007. During a psychological evaluation, Ms. Graves "reported that G.L.G. was developing language and spoke in sentences up until he was around two or three years old and then begin to regress." Pet. Ex. 8, p. 11. In the history portion of a July 3, 2008 initial evaluation at Heartland Rehabilitation Services, Ms. Graves reported that she noticed symptoms of autism when G.L.G. was 24 to 30 months old. Pet. Ex. 10, p. 7. In particular, she conveyed that she had noticed G.L.G.'s "speech was declining and his fine and gross motor skills were lacking." *Id.* A notation contained in the history of present illness ["HPI"] section of the record from a January 28, 2009 visit to G.L.G.'s pediatrician indicates "[p]atient is autistic and mom wants him checked for lead. Duration: symptoms for autism started at 2 y.o." Res. Ex. F, p. 57. An occupational therapy note dated September 16, 2009, indicates that "[m]other reports she began to notice a decline in speech and fine motor skills at age 2.5 [years], and after a long process he was diagnosed with autism." Pet. Ex. 10, p. 28.

In summary, subtle symptoms of autism are reflected in G.L.G.'s medical visit records when he was 19 and 28 months old. G.L.G. was unable to point to five body parts at 19 months of age, and he was not using pronouns properly at 28 months of age. According to Ms. Graves's own accounts as documented in G.L.G.'s medical records, she noted sufficient symptoms of autism to cause her concern when G.L.G. was between two and three years of age.

B. Petitioners' Submissions Regarding G.L.G.'s First Symptom of Autism.

Petitioners assert that the vaccines G.L.G. received on October 14, 2004 caused his autism but that he did not exhibit any symptom of autism until April 4, 2006.[11] Pet. Second Petition, filed Apr. 21, 2009, at 1. On that date, Ms. Graves maintains that G.L.G. started to spin and experienced a decrease in his vocabulary. *Id.* at 2. In her March 24, 2011 statement, Ms. Graves expanded on her assertion, indicating that "[i]t wasn't until G.L.G. started 'spinning' @ the age of 3 when I actually realized the onset of [his] inury." Pet. Theory at 1.

However, the Federal Circuit in *Cloer* ruled that the date of first symptom or onset of injury does not on depend on whether a petitioner knew "anything adverse about her condition" or that the condition was caused by a vaccine. 654 F.3d at 1339. Rather, the test is when the first symptom or manifestation of onset would be "recognized as such by the medical profession at large." *Cloer,* 654 F.3d at 1325.

In her response to my show cause order, Ms. Graves claimed she was "off" when she stated earlier that G.L.G.'s speech delay began when he was two years old. Pet. Response to SC Order, filed Aug. 20, 2013, at 1; *see, e.g.*, Pet. Ex. 10, p. 7. She now

---

[11] As I explained to Ms. Graves during the September 26, 2012 telephonic status conference, she is in a "Catch 22" situation with regard to the facts in this case. If, as Ms. Graves remembers, G.L.G. did not exhibit his first symptom of autism until April 4, 2006, almost a year and a half after his October 14, 2004 vaccinations, it will be difficult for petitioners to prove that G.L.G.'s vaccinations caused his injuries.

asserts G.L.G.'s speech delay did not begin until shortly before their move to Yulee, FL in March 2006, when G.L.G. was almost three years old. Pet. Response to SC Order at 2.

C. Respondent's Evidence and Arguments.

During the OAP test cases, three pediatric neurologists with considerable experience in diagnosing ASDs provided testimony regarding the commonly recognized symptoms of autism. Respondent filed excerpts of that evidence in this case.[12] *See* Res. Exs. H-L (excerpts from the OAP testimony of three neurologists and two articles regarding the development of language in children with ASD filed by respondent). *White v. Sec'y, HHS*, 04-337V, 2011 WL 6176064 (Fed. Cl. Spec. Mstr. Nov. 22, 2011) contains a detailed discussion of the same OAP testimony and the medical journal articles filed by respondent in this case. As I noted in *White*, "[s]peech and language delays are the symptoms most commonly reported by parents as a concern leading to a diagnosis of ASD." *White*, 2011 WL 6176064, at *11 (citing R. Luyster, et al., *Language Assessment and Development in Toddlers with Autism Spectrum Disorders*, J. AUTISM DEV. DISORD. 38: 1426-38, 1426 (2008), filed in this case as Res. Ex. H).

In the OAP test cases, Dr. Eric Fombonne testified that one of first concerns noted by parents is a lack of language development, usually noticed when the child is 15 to 18 months old. Res. Ex. J at 50 (page 1284 in the original transcript). Doctor Michael Rutter testified that problems in social and communication domains tend to be observed much earlier than stereotyped behaviors such as the "spinning" noticed by Ms. Graves on April 4, 2006. Res. Ex. L at 21 (page 3253 in the original transcript); *see* Pet. Statement, filed Apr. 21, 2009, at 1. As noted by respondent, the authors in the Landa article indicated most parents of children diagnosed with ASD had become concerned about ASD symptoms by 18 months of age and 80% of parents have noticed abnormalities by 24 months. Respondent's Motion to Dismiss at 4 (citing R. Landa, *Diagnosis of autism spectrum disorders in the first 3 years of life*, NATURE CLINICAL PRACTICE Neurology, 4(3): 138-47 (2008), filed in this case as Res. Ex. I).

Respondent noted Ms. Graves own statements about onset recorded in G.L.G.'s medical records "place the onset of G.L.G.'s symptoms between two and two and a half years of age." Res. Motion to Dismiss at 2. Respondent noted "these records are not contemporaneous with the onset of symptoms (due to a gap in medical care)" but argued "they are the best indicia of reliability available, because they were created in the context of seeking medical care for G.L.G. and were created much closer in time (2008 and 2009) to the onset of G.L.G.'s symptoms than petitioners' 2013 Response." *Id.*

---

[12] Although the testimony excerpts from the OAP cases were from witnesses called by respondent, it did not appear that what constituted symptoms of autism was a matter in controversy in the OAP. Petitioners in this (or any other OAP case) remain free to counter such evidence with contrary testimony, journal articles, or other filings.

D.  Analysis.

Special masters frequently accord more weight to contemporaneously recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony.  "It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight." *Murphy v. Sec'y, HHS*, 23 Cl. Ct. 726, 733 (1991) (citation omitted); *see also Cucuras v. Sec'y, HHS*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (medical records are generally trustworthy evidence).  Memories are generally better the closer in time to the occurrence reported and when the motivation for accurate explication of symptoms is more immediate.  *Reusser v. Sec'y, HHS*, 28 Fed. Cl. 516, 523 (1993).

Ms. Graves' more recent assertions in response to the motion to dismiss and the show cause order are much like the oral testimony referred to in *Murphy*, 23 Cl.Ct. at 733.  Although Ms. Graves's earlier statements were made several years after the events in question (between May 9, 2007 and September 16, 2009), they still were made closer in time than her August 20, 2013 statement.  Additionally, Ms. Graves was providing the earlier information to G.L.G.'s treating physicians and thus, motivated only by her desire to obtain care for G.L.G.  I do not mean to imply that petitioner was not honest when making her later assertions, simply that memories are less reliable as more time passes and Ms. Graves may be influenced by her desire to show her claim was timely filed when making her August 20, 2013 statement.  Furthermore, Ms. Graves's earlier statements agree with the timeframe normally seen for the first symptom of autism, and are consistent with progression of the subtle delays recorded in G.L.G.'s records of his 18 and 24 month well child visits.

The Federal Circuit held recently in *Carson* that speech delay can be the first objectively recognizable symptom of autism.  *Carson ex rel. Carson v. Sec'y, HHS*, 727 F.3d 1365, 1370 (Fed. Cir. 2013).  It does not matter that speech delay alone is not sufficient for a diagnosis of autism, "may be indicative of a variety of conditions or ailments," or that a lay person may not "appreciate the medical significance" of the speech delay.  *Carson*, 727 F.3d at 1369 *(quoting Markovich v. Sec'y, HHS,* 477 F.3d 1353, 1357 (Fed. Cir. 2007)).

In the medical records, Ms. Graves consistently reported that G.L.G. began displaying speech delay between 24 to 36 months of age.  That time period is somewhat later than that reported by most parents of children with autism.  When Ms. Graves' reports are considered along with the specific delays noted in G.L.G.'s medical records, they provide preponderant evidence that G.L.G. displayed symptoms of autism more than 36 months before this claim was filed.  Thus, the petition was filed after the expiration of the Vaccine Act's statute of limitations.

## IV.  Equitable Tolling.

There is no basis for applying the doctrine of equitable tolling in this case.  Although Ms. Graves claimed the continued statements of G.L.G.'s pediatrician, Dr.

Marrero, that she get Medicaid "could be considered a form of 'duress'" (Response to Show Cause Order, July 16, 2013, at 1), these statements do not constitute the duress referenced to in *Cloer,* 654 F.3d at 1344-45.

To justify the application of equitable tolling, Ms. Graves must show she experienced some type of fraud or duress which prevented her from filing her petition before the expiration of the statute of limitations. The "duress" alleged by Ms. Graves only prevented her from obtaining medical care for G.L.G. Since the Federal Circuit specifically held that the Vaccine Act does not contain a discovery rule, G.L.G.'s level of medical care is not relevant to the issue of timeliness. Petitioners were required to file their petition within 36 months of G.L.G.' first symptom or manifestation of onset, an objective event which was not affected by the medical care G.L.G. was or was not receiving.

## V. Conclusion.

Petitioners have the burden to show timely filing. Petitioners have failed to do so. There is preponderant evidence that this case was not filed within "36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury" as required by the Vaccine Act. § 16(a)(2). Furthermore, petitioners have not demonstrated any extraordinary circumstances warranting equitable tolling. **Thus, this claim is dismissed as untimely filed under the Vaccine Act's statute of limitations. The clerk is directed to enter judgment accordingly.**

**IT IS SO ORDERED.**

_____
Denise K. Vowell
Chief Special Master