# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## OFFICE OF SPECIAL MASTERS
### No. 05-266V
### Filed: July 3, 2013
### Not for Publication

* * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| BOB and CARMEL MOONEY, parents | * | |
| of Elizabeth L. Mooney, a minor child, | * | Findings of Fact; Onset; Autism |
| Petitioners, | * | Spectrum Disorder; Contemporaneous |
| v. | * | Medical Records; Subsequent |
| | * | Medical Histories and Testimony; Video |
| SECRETARY OF HEALTH | * | Records; Lack of Factual Predicate for a |
| AND HUMAN SERVICES, | * | Table Injury Claim. |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

Michael Cave, Esq., Cave Law Firm, Baton Rouge, LA, for petitioners.
Alexis Babcock, Esq., U.S. Dept. of Justice, Washington, DC, for respondent.

### RULING ON FACTS AND ORDER TO SHOW CAUSE[1]

**Vowell,** Special Master:

On February 28, 2005, Bob and Carmel Mooney ["Mr. Mooney," "Mrs. Mooney," or "petitioners"] filed a short-form petition, authorized by Autism General Order # 1,[2] for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[3] [the "Vaccine Act" or "Program"], on behalf of their minor daughter, Elizabeth L. Mooney ["Elizabeth"].

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002). In accordance with Vaccine Rule 18(b), petitioners have 14 days to identify and move to delete medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will delete such material from public access.

[2] The text of Autism General Order #1 can be found at http://www.uscfc.uscourts.gov/sites/default/files/autism/Autism+General+Order1.pdf, 2002 WL 31696785 (Fed. Cl. Spec. Mstr. July 3, 2002).

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2006).

By filing a short-form petition, petitioners joined the Omnibus Autism Program ["OAP"],[4] thereby asserting that Elizabeth had an autism spectrum disorder ["ASD"] and that one or more vaccines listed on the Vaccine Injury Table[5] were causal of this condition. The theories of causation eventually litigated in the OAP were that the measles, mumps, and rubella ["MMR"] vaccine, acting alone or in combination with a mercury-based vaccine preservative (thimerosal), caused autism [the "MMR theory" or "Theory 1"] or that thimerosal-containing vaccines [the "TCV theory" or "Theory 2"] were causal. After the conclusion of the appellate process in the OAP test cases, petitioners switched gears and filed an amended petition that alleged Elizabeth had suffered a Table encephalopathy after her 15-month vaccinations.[6] Amended Petition, filed July 18, 2011.

During an August 18, 2011 status conference, I noted that the filed records did not appear to support a Table encephalopathy claim and suggested that petitioners reexamine their theory of causation. Given the nature of the conflicts between petitioners' joint affidavit and the contemporaneous records (medical records and Mrs. Mooney's own journal[7]), I expressed doubt about whether petitioners had a reasonable basis for pursuing a Table injury claim. *See* Order, issued Aug. 18, 2011, at 1; *see also* § 13(a)(1) (prohibiting a special master from finding entitlement to compensation "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion").[8] In particular, I noted that no encephalopathy and no symptoms such as her

---

[4] The OAP is discussed in detail in *Dwyer v. Sec'y, HHS*, No. 03-1202V, 2010 WL 892250, at *3 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

[5] 42 C.F.R. § 100.3 (2011).

[6] What constitutes a "Table encephalopathy" is discussed in more detail in Section IV, but the requirements are set forth in the Qualifications and Aids to Interpretation ["QAI"] section of 42 C.F.R. § 100.3. Autism Gen. Order #1 indicated that those petitioners who were alleging Table encephalopathy claims could proceed to hearing on their claims without waiting for the conclusion of the OAP, which contemplated future hearings on causation in fact cases. Autism Gen. Order #1 at 7-8. For reasons not clear from the records, petitioners apparently decided to wait until the test cases were tried and decided before asserting their Table encephalopathy claim.

[7] Mrs. Mooney maintained a journal to document milestones, family outings, memories, and her general reflections as Elizabeth grew up. She intended to give the journal to Elizabeth when she was older. Tr. at 48-49. This journal was originally filed on October 17, 2011 as Petitioners' Exhibit ["Pet. Ex."] 10. Petitioners later refiled it as Pet. Ex. 22. In an April 19, 2012 order.

[8] Although § 13(b)(2) permits a special master to find that the first symptom of a vaccine injury occurred during the period required by the Vaccine Injury Table for a Table injury even if the symptom was not recorded or a record incorrectly reflects that it occurred outside the period, I note that decisions in vaccine cases tend to rely more heavily on contemporaneous medical records rather than testimony or affidavits made months or years after the events in question. *See infra* p. 5. Additionally, in this case, Mrs. Mooney's journal, which described other significant events, illnesses, concerns, and achievements, failed to record the dramatic changes in Elizabeth that petitioners now claim occurred shortly after her June 2003 vaccinations.

parents described in their affidavit were noted during several medical visits and journal entries in the six months following Elizabeth's June 5, 2003 vaccinations.[9]

On April 13, 2012, petitioners filed a second amended petition [hereinafter "Petition"], which now constitutes the operative petition for this vaccine injury claim. It is virtually identical to the first amended petition, and alleges only the Table injury claim of encephalopathy within 72 hours of the vaccinations administered on June 5, 2003.[10] Petition, ¶¶ 1f-i, 6. The petition identifies the diphtheria, tetanus, and pertussis ["DTaP"], hepatitis B, haemophilus influenza type B ["Hib"], and pneumococcal vaccines administered on June 5, 2003 as causal. Petition, ¶ 1h. However, encephalopathy is an injury appearing on the Table only with regard to one of these vaccines, the DTaP vaccine. Therefore, **petitioners' claim that the hepatitis B, Hib, and pneumococcal vaccines caused a Table encephalopathy are dismissed as a matter of law.** References to the "allegedly causal vaccine" throughout this ruling and order are to the DTaP vaccine alone.

In March 2012, petitioners requested a hearing to resolve factual disputes regarding their Table claim. The hearing was conducted in Sacramento, CA, on July 26, 2012. My factual findings are set forth in Section III below. References to petitioners' exhibits are made using the exhibit designations set forth in my April 19, 2012 Order.[11]

## I. Scope of This Ruling.

In many vaccine cases, a fact hearing is used to resolve issues concerning the first symptoms for purposes of determining if the claim was timely filed. However, this fact hearing was held to address whether Elizabeth presented with symptoms consistent with the Table injury of encephalopathy. Thus, this ruling focuses on determining Elizabeth's health and development prior to the allegedly causal vaccine and what transpired between that June 5, 2003 DTaP vaccination and December 2003, a period encompassing the six months after it was administered. It was necessary in order to resolve the inconsistencies between the facts as alleged in the petition and supported by petitioners' joint affidavit and the evidence that appears in the remainder of the exhibits, which include contemporaneous medical records, medical histories as

---

[9] In the six month period after the June 5, 2003 vaccinations, Elizabeth was seen once in the emergency room and by her pediatrician for both well and sick child visits. The inconsistencies between petitioners' claims and the records are set forth in more detail in Section IV below.

[10] The petitions only differ in their inclusion and labeling of petitioners' exhibits. The substantive paragraphs of the petitions are identical.

[11] This order was necessitated by petitioners' counsel's inconsistencies in exhibit numbering. Although petitioners had filed a binder containing exhibits 1-9 on June 12, 2009, the first amended petition referred to exhibits 2a-j, and the second amended petition lists exhibits 2-20. Based on these inconsistencies, I reassigned exhibit numbers to all of petitioners' exhibits.

3

supplied by petitioners to specialists and therapists months or years after the events in question, Mrs. Mooney's journal, photographs of Elizabeth, and videos[12] taken of Elizabeth as an infant, toddler, and young child.

After reviewing the evidentiary record, including the hearing testimony, it is apparent that the most significant issue is whether Elizabeth displayed symptoms of a Table injury at all, either after the vaccination or in the following six months. Both Mr. and Mrs. Mooney testified at the hearing that she had symptoms consistent with a Table encephalopathy in the 72 hours after the vaccination and that some of these symptoms persisted in the weeks and months afterwards. The evidence, apart from their testimony and affidavit, overwhelmingly establishes that she did not experience symptoms of the nature and severity required for a Table encephalopathy, and that any mild and transient vaccine reaction she may have experienced after the June 5, 2003 vaccinations abated and Elizabeth returned to her baseline behavior and level of functioning, adding new words and skills over the ensuing months.

I find no reliable evidence that Elizabeth experienced an acute encephalopathy, as defined by the Vaccine Injury Table and the QAI, within 72 hours of her June 2003 DTaP vaccination. Furthermore, the video, medical, and journal records establish that although Elizabeth may have displayed symptoms of an autistic disorder both before and after her June 2003 DTaP vaccination, she did not manifest a chronic encephalopathy, as defined by the Table, during the six month period following this vaccination.

In medical histories provided before this claim was filed, and before Elizabeth began treatment with Dr. Stephanie Cave,[13] the mother of petitioners' counsel in this case,[14] petitioners described the symptoms of autism as beginning at about 20-24

---

[12] Petitioners' exhibit 23 contains two files: "Elizabeth Mooney Tape 1 of 2 Master" and "Elizabeth Mooney Tape 2 of 2 Master." In this ruling, "tape 1 of 2" will be referenced as Pet. Ex. 23.1 and "tape 2 of 2" will be cited as Pet. Ex. 23.2.

[13] Petitioners began Elizabeth's treatment with Dr. Cave in January 2005. Pet. Ex. 11, pp. 9-13; *see also* Journal, Pet. Ex. 22, at 17 (entry from Jan. 13, 2005, noting that they were "going to Baton Rouge, LA [where Dr. Cave is located] in 2 weeks"). During the hearing, both parties inferred that Dr. Cave saw Elizabeth in December 2004. Tr. 62-63, 80. However, although records from a December 18, 2004 appointment appear in Dr. Cave's records they are from an appointment Elizabeth had with Dr. Lisa Hosbein. Pet. Ex. 11, pp. 84-85. A page of Dr. Hosbein's records also appears in the Auburn Bell Pediatrics records. Pet. Ex. 13, p. 13.

[14] The records from Dr. Cave, Pet. Ex. 11, include several emails between Mrs. Mooney and Dr. Cave regarding questions concerning Elizabeth's treatment and information Mrs. Mooney needed for an article she was writing. I note that one of the emails includes Mrs. Mooney, Mr. Cave, and Dr. Cave. Pet. Ex. 11, p. 21. The original petition in this case was filed by Mr. Cave about one month after Elizabeth was first seen by Dr. Cave.

4

months of age.[15]  Thus, by their own accounts, made closer in time to the events in question, Elizabeth's autism symptoms manifested between October 2003 (about four months after the allegedly causal vaccination) and February 2004.

I thus find that petitioners have failed to establish the predicate facts for a Table injury, and petitioners are ordered to show cause why I should not dismiss their case.

## II.  Resolving Evidentiary Conflicts.

A.  Law Pertinent to Evidentiary Conflicts.

Conflicts between contemporaneous records and testimony given several years later at a hearing are common in Vaccine Act cases, and this case is no exception.  Two general legal principles guide the resolution of conflicts between contemporaneous records and later-adduced evidence.  The first is that the absence of a reference to specific symptoms in a medical record does not conclusively establish the absence of symptoms during that time frame.  *See, e.g.*, *Murphy v. Sec'y, HHS*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance" (citation omitted)).

The second principle addresses the degree of reliance commonly accorded to contemporaneous records.  Special masters frequently accord more weight to contemporaneously recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony.  "It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight."  *Murphy*, 23 Cl. Ct. at 733 (citation omitted); *see also Cucuras v. Sec'y, HHS*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (medical records are generally trustworthy evidence).  Memories are generally better the closer in time to the occurrence reported and when the motivation for accurate explication of symptoms is more immediate.  *Reusser v. Sec'y, HHS*, 28 Fed. Cl. 516, 523 (1993).  Inconsistencies between testimony and contemporaneous records may be overcome by "clear, cogent, and consistent testimony" explaining the discrepancies.  *Stevens v. Sec'y, HHS*, No. 90-221V, 1990 WL 608693, at *3 (Fed. Cl. Spec. Mstr. Dec. 21, 1990).

---

[15]  *See*, *e.g.*, Pet. Exs. 3, p. 1 ("According to her mother . . . [Elizabeth] stopped adding new words [at 22 months]. . . . All physical and developmental milestones were reported to be within normal limits, except in the area of communication "); 4, p. 1 ("Elizabeth did not progress in vocabulary acquisition [after 20 to 22 months of age]"); 5, p. 2 ("Concerns arose when Elizabeth was approximately 20 months of age"); 8, p. 1 ("Mrs. Mooney reports that Elizabeth was a very happy and normally developing baby until approximately 24 months of age . . . ."); 11, p. 84 ("developed completely normally until 20 mos").

B.  Credibility Determinations.

For the most part, I did not find sufficient indicia of reliability in the testimony of petitioners to credit their testimony over the evidence found in the contemporaneous records.  Their accounts of what occurred following Elizabeth's June 5, 2003 vaccinations were inconsistent with Mrs. Mooney's journal, as well as inconsistent with observations and statements made in contemporaneous records.  Most strikingly, they are inconsistent with videos taken of Elizabeth within a week of the June 5 DTaP vaccination[16] and with videos taken in the months that followed.  Although it is not unusual for some details to be missing from the contemporaneous records, the specific facts of this case, the improbability of the petitioners' description of events, and Mrs. Mooney's own journal entries[17] make it highly unlikely that their otherwise unsupported accounts are accurate.  I also considered the length of time that has passed since the events in question, to be an important consideration when evaluating the accuracy of their recollections.

I emphasize that I am not questioning the sincerity or honesty of the testimony Mr. and Mrs. Mooney provided.  Rather, it appears that their recollection of the days surrounding Elizabeth's June 5, 2003 vaccinations and the behaviors she displayed in the ensuing months have been impacted by the passage of time, and influenced by their internet research, information supplied by other parents, and some suggestions of non-traditional health care providers.[18]  Accordingly, I placed more weight on the

---

[16] The first video recording of Elizabeth after the allegedly causal vaccination is dated June 11, 2003, and shows Elizabeth seated in a child's chair sucking her thumb.  She initially does not respond to her name, but then turns her face towards the video camera.  Pet. Ex. 23.1 at 1:17:23.  Two days later, on June 13, 2013, Elizabeth is seen pushing a doll stroller while walking on her knees, trying on sunglasses, and walking while holding on to the doll stroller.  *Id.* at 1:17:47.  On June 16, 2013, Elizabeth walks unassisted for the first time.  *Id.* at 1:19:21.

[17] Mrs. Mooney's journal is heartbreaking.  The early entries describe a beautiful, engaging, and much loved infant and toddler.  Although she documents that Elizabeth walked late (Pet. Ex. 22 at 10), displayed some fussiness and high pitched screaming as early as May, 2003 (*id.*), and slowly developed language (*see, e.g., id.* at 11), her love for Elizabeth and her pride and joy in her actions and achievements are evident on every page.  Her entry on March 30, 2004, is the first record reflecting her fear that Elizabeth might be autistic.  *Id.* at 12.  The entries between this one and Elizabeth's diagnosis with autism on November 30, 2004, reflect her growing concerns about Elizabeth's behavior.  *See id.* at 12-15.  The remaining entries describe the whirlwind of treatment options explored and the ups and downs of Elizabeth's language use, interactions with others, and increasingly more difficult behavior, culminating in her placement in Elk Grove Home for Children, a 24 hour care facility, on July 17, 2007.  *Id.* at 15-19; *see* Tr. at 6-7 (testimony about placement).

[18] *See* Tr. at 50, 62, 66-67; Pet. Ex. 22 at 12, 15-16 (journal entries discussing results of internet searches and conversations with other parents concerning autism and research into chelation therapy); Pet. Ex. 13, p. 3 (pediatrician's office indicating a willingness to assist petitioners obtain lab testing "as long as it was something that was necessary and in the [doctor's] scope of practice"); Pet. Ex. 11, pp. 18-21 (emails between Mrs. Mooney and Dr. Cave regarding an article Mrs. Mooney was writing on alternative treatments for autism); Pet. Ex. 23.2 at 1:23:29 (video voice over discussing the role of mercury and aluminum in autism after petitioners' first visit Dr. Cave in January 2005).

contemporaneous medical records and accounts, rather than on petitioners' testimony and affidavits, as support for the facts found herein.

### III. Factual Findings.

A. Facts Not Reasonably Subject to Dispute.

1. Elizabeth was born on February 11, 2002. She was a healthy newborn, with Apgar scores of 8 and 9.[19] Pet. Ex. 15, p. 4. She was petitioners' second child;[20] an older sister, Faith, resided in the same family home when Elizabeth was born and throughout Elizabeth's residence there.[21]

2. During her first year of life, Elizabeth received routine childhood immunizations[22] and was healthy with no major illnesses. Her growth and development were assessed as normal,[23] except as referenced below.

3. Elizabeth was seen for several illnesses, including fever, obstructed tear ducts, failure to thrive, and gastroenteritis during her first year. Although not directly bearing on the Table injury claim, these visits establish that Elizabeth was promptly seen and treated for relatively minor conditions and that the visits were frequently recorded in Mrs. Mooney's journal, and thus they are summarized below:

---

[19] The Apgar score is a numerical assessment of a newborn's condition (with lower numbers indicating problems), usually taken at one minute and five minutes after birth. The score is derived from the infant's heart rate, respiration, muscle tone, reflex irritability, and color, with from zero to two points awarded in each of the five categories. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ["DORLAND'S"] (32th ed. 2012) at 1682.

[20] Mrs. Mooney has a third daughter from a prior marriage. Tr. at 68-69.

[21] Elizabeth was placed in a 24 care facility on July 17, 2007. Pet. Ex. 5, pp. 10-15; Tr. at 6-7.

[22] On April 22, 2002, Elizabeth received her first vaccinations, which included Prevnar, inactivated polio vaccine ["IPV"], DTaP, and a combined hepatitis B/Hib vaccine. Pet. Ex. 2, pp.1-2. She received the second round of the same vaccinations at her four month well child visit. *Id.* She received her third Prevnar, IPV and DTaP vaccinations at her six month well child visit on August 23, 2002. *Id.*

[23] There is only a computer record, which does not contain the examination notes, for Elizabeth's two month well child visit. Pet. Ex. 13, pp. 61-62. However, her growth and development were considered normal at her four month well child visit. *Id.*, pp. 37, 61-62. Her development was considered normal at her six month well child visit, but there were concerns about her growth. *Id.*, p. 37. Her computerized chart for this visit reflects a "feeding problem," presumably referring to her low weight. *Id.*, p. 60. Subsequent computer records reflect a diagnosis of failure to thrive on September 18, 2002 (*id.*, p. 60), and on November 26, 2002 (*id.*, p. 59). Her development was assessed as normal at her nine month well child visit on November 26, 2002. Pet. Ex. 16, pp. 7, 20. She pulled to stand, sat without support, and made repetitive sounds. *Id.*

a. Elizabeth experienced a high fever on August 8, 2002.[24] Her pediatrician, Dr. Joyce Bradshaw, sent her to the hospital for antibiotic treatment and testing. Pet. Ex. 13, pp. 38-40. The testing included blood and urine cultures, which showed no growth, but the blood counts showed some high and low values. *Id.*, pp. 94-96. Apparently these values were not concerning, as the only comment in the record is that the cultures were negative. *Id.*, p. 76. Mrs. Mooney recorded the fever, hospital visit, and tests in her journal. Pet. Ex. 22 at 8.

b. She had a crusty eye discharge on September 18, 2002. She was diagnosed with a likely nasolacrimal duct obstruction, and massage was recommended. Pet. Ex. 13, p. 36. A weight check was also performed at this visit. *Id.*, p. 60; *see also* Pet. Ex. 22 at 8 (journal entry from September 19, 2002 indicating concern about Elizabeth's weight).

c. At her six month well child visit on August 23, 2002, Dr. Bradshaw noted Elizabeth's height-weight ratio was at 10%, and requested that she return for evaluation in one month.[25] She returned on September 18, 2002. Her height-weight ratio was still at 10%. Doctor Bradshaw noted that a "failure to thrive" workup should be considered at nine months if Elizabeth's pattern of low weight gain continued. This September 2002 reference to failure to thrive is the first use of the term in Elizabeth's medical records.[26] Pet. Ex. 13, p. 36. At the nine month well child visit on November 26, 2002, her height and weight both remained at the 10th percentile. Although Mrs. Mooney indicated that her older daughter was also small and that she was not concerned about Elizabeth's weight, Dr. Bradshaw indicated that she would continue to monitor Elizabeth's weight gain. Pet. Ex. 13, p. 34.

d. On January 20, 2003, Elizabeth was seen for fever and diarrhea, and was diagnosed with gastroenteritis. In spite of the illness, she was sitting up, alert, playful, and smiling during the visit. Pet. Ex. 13, pp. 58-59. Mrs. Mooney recorded this illness in her journal, noting that Elizabeth had a "bad flu." Pet. Ex. 22 at 9.

---

[24] Elizabeth had a possible exposure to leptospirosis, an infection that can be acquired from exposure to pet urine. A family puppy had died recently, and leptospirosis was suspected in the puppy's death. Pet. Ex. 13, p. 38; DORLAND'S at 1024.

[25] On June 13, 2002, Elizabeth's weight was recorded as 14 lbs, 6 ozs. On August 8, 2002, she weighed 14 lbs, 1 oz, and at her six month well-child visit Elizabeth's weight was noted to be 14 lbs, 5 oz. Doctor Bradshaw indicated that the June weight was possibly wrong, but wanted an appointment to recheck Elizabeth's weight. Pet. Ex. 13, p. 37.

[26] When Elizabeth first presented with an issue regarding failure to thrive is a matter in dispute. Her parents both testified that concerns over Elizabeth's weight gain and use of the term "failure to thrive" first occurred after her June 5, 2003 immunizations (Tr. at 22, 57-58, 108), but it is clear from the pediatric records that the first concerns about her weight gain and stature occurred at the time of her six month well child visit. There were no medical records reflecting concerns about Elizabeth's weight after the allegedly causal vaccination.

8

6. During her second year, Elizabeth had three well child visits and several sick visits. These visits are summarized below as they provide information about Elizabeth's growth and development prior to and after the allegedly causal vaccination:

a. After her first birthday, Elizabeth's next well child visit took place on March 3, 2003, when she was not quite 13 months of age. Her growth and development were assessed as normal. Elizabeth was using a cup instead of a bottle, indicating her wants without crying, and had a vocabulary of at least two to three words, but she was not yet walking. Her height and weight had improved, with both at the 20th percentile. Urinalysis showed a trace amount of blood and protein, but there was not enough urine to send for a urine culture. The plan was to repeat the urinalysis. Pet. Ex. 13, p. 34. She received her first MMR and varicella vaccinations at this visit. Pet. Ex. 2, pp. 1-2.

b. Based on the urinalysis results obtained on March 3, 2003, a repeat urinalysis was performed on March 4, 2003. This testing showed mixed gram positive flora and mixed gram negative rods. Pet. Ex. 13, p. 30. Another sample was ordered on March 5, 2003, which proved difficult to obtain. *Id.*, pp. 30, 33. On March 9, 2003, a urine sample tested positive for bacteria and antibiotics were prescribed to treat this urinary tract infection. *Id.*, p. 32.

c. Elizabeth returned for her next well child visit on June 5, 2003, when she was almost 16 months of age. The developmental screening checklist recorded that she could walk two steps,[27] indicate her wants without crying, speak at least two to three words, had pincer grasp, and was using cups. Pet. Ex. 13, p. 29. Elizabeth received the allegedly causal DTaP vaccination (her fourth), plus her fourth Prevnar vaccination at this visit. Pet. Ex. 2, pp. 1-2. Among the teaching topics checked as discussed with Mrs. Mooney was "IZ Reactions," which I interpret as meaning "immunization reactions." Pet. Ex. 13, p. 29.

7. The video records[28] for the four month period between her first birthday (February 11, 2003) and the one closest in time to the June 5, 2003 vaccines (June 4,

---

[27] The checklist contains the skill "Walks" and the evaluator wrote "2 steps" next to this word. Pet. Ex. 13, p. 29. There is other evidence to suggest that Elizabeth was not yet walking, and certainly not walking well. In early May 2003, Mrs. Mooney noted that Elizabeth was "cruising holding onto stuff" and predicted that she would soon be walking. Journal, Pet. Ex. 22, at 10. The journal entry from June 16, 2003, notes that Elizabeth walked for the first time that evening and that Mrs. Mooney caught it on film. *Id.* at 10; *see also* Pet. Ex. 23.1 at 1:19:21 (the video of Elizabeth's first steps, as narrated on the video by Mrs. Mooney).

[28] I have reviewed the complete video record filed as Pet. Ex. 23. Together the two files on the DVD consist of approximately three hours of recordings of Elizabeth and occasionally her sister. Although petitioners identified the recordings as an exhibit they intended to use at the July 26, 2012 hearing (*see* Petitioners' Status Report, filed July 9, 2012), no excerpts of this exhibit were played at the hearing.

2003) reflects that, as to the periods recorded, Elizabeth frequently failed to respond to her name and occasionally flapped her hands.[29]  Based on my experience in many other vaccine injury claims, including the OAP test cases, I am aware that lack of response to name in a toddler is considered an early manifestation of autism.  Hand flapping in a toddler (as opposed to an infant), may also be a symptom.  *Cedillo v. Sec'y, HHS,* No. 98-916V, 2009 WL 331968 at *96-97 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010).

B.  Contested Matters.

The parties are in basic agreement about Elizabeth's health and behavior up to June 5, 2003, however they strongly differ on what transpired after her June 5, 2003 vaccinations.  The primary matters in dispute concern (1) Elizabeth's immediate reaction to her vaccinations and (2) the symptoms Elizabeth displayed in the ensuing six months.  With very limited exceptions, the contemporaneous medical records and medical histories provided within a year or two of the vaccines in question do not support petitioners' allegations.

With regard to the time period between June 2003 and December 2003, I make the factual findings set forth in the following paragraphs.  In Section IV below, I discuss petitioners' contrary contentions regarding Elizabeth's behavior and the reasons I rejected their assertions.  I note that the issue is not whether Elizabeth exhibited some of the behaviors diagnostic of autism in the months that followed her June 5, 2003 vaccinations; it is whether she exhibited the symptoms reflective of an "acute encephalopathy" followed by a "chronic encephalopathy," as defined by the Table's QAI.

1.  Although Elizabeth may have experienced a transient reaction to her June 5, 2003 vaccinations, manifested by sleeping longer and harder than she normally did, a slight fever, and some lethargy, she did not experience a significantly decreased level of consciousness lasting at least 24 hours, nor was her condition ever sufficiently severe so as to require hospitalization.  She responded to her environment without the need for loud voices or painful stimuli.  There was no evidence that she did not recognize her parents, sister, or familiar objects.  Although her parents testified to some reduced eye contact during a 24 hour period after the June vaccinations, I do not credit this testimony, nor do I accept that the reluctance to make eye to eye contact often seen in children with autism, is of the same order of magnitude as the decreased or absent eye contact that would warrant hospitalization, as described in the Table's QAI.

---

[29] *See, e.g.*, February 19 (Pet. Ex. 23.2 at 25:18), April 22 (Pet. Ex. 23.1 at 1:07:33), May 20 (Pet. Ex. 23.2 at 1:10:58), and May 28, 2003 (Pet. Ex. 23.1 at 1:14:05) (documenting Elizabeth's failure to respond); February 9 (Pet. Ex. 23.1 at 59:45), February 17 (Pet. Ex. 23.2 at 23:04), and April 1, 2003 (Pet. Ex. 23.1 at 1:04:24) (showing hand flapping).

2.  During the six month period following the June 5, 2003 vaccinations, Elizabeth did not demonstrate symptoms consistent with a chronic encephalopathy.  During this period, Elizabeth was seen by several health care providers.  None recorded any symptoms consistent with a chronic encephalopathy.  Rather, the records reflect a child who interacted with her environment and responded to her parents and caregivers.  Mrs. Mooney's journal and the video clips filed provide additional evidence that Elizabeth did not experience a chronic encephalopathy during this period.  They reflect eye contact, interactions with others, and pretend play, albeit with few words.[30]

a.  The first journal entry after the June 2003 vaccinations is from June 16, 2003.  It reflects a significant milestone—Elizabeth's first unaided steps.  The video from the event shows Elizabeth responding to cheers when she walked for the first time.  Pet. Ex. 23.1 at 1:19:21.  The next two journal entries are dated July 1 and July 24, 2003.[31]  In the first of these entries, Elizabeth is briefly described as still preferring crawling to walking, but walking more often.  Pet. Ex. 22 at 10.  The second reflects that Elizabeth had not "been acting like [herself] lately," but does so in the context of a recurring runny nose for the last few weeks.  Id.  Other entries reflect thumb-sucking, being playful on her mother's lap, and exploring what appears to read either "rocks" or "books," while her older sister took swimming lessons.  Id.  There is no mention of lethargy, aloofness,[32] disinterest in her environment, or any lack of eye contact.

b.  Elizabeth was first seen by a health care provider after the June 5 vaccinations on August 1, 2003, when she was taken to the Dominican Hospital emergency room ["ER"] for vomiting.  Her parents were asked about her medical history; the record reflects they reported that Elizabeth had not experienced any serious illnesses.  Her physical exam was normal, and she was both alert and oriented to her environment.  Pet. Ex. 20, pp. 2-4. During one evaluation, she was happy, smiling, and singing while at another she was in tears, but easily consolable, awake, alert, talking,

---

[30] In watching the video recordings of Elizabeth from 12-36 months of age, I observed few true words.  This does not mean that she did not speak or have the 10 to 15 word vocabulary attributed to her at her 18 month well child visit (Pet. Ex. 13, p. 23), but it is striking that she did not talk on these video clips.

[31] The journal entries were made periodically, not daily or weekly.  They sometimes describe the events of a particular day or summarize events occurring over a period of time between entries.

[32] It appears from the medical records and Mrs. Mooney's journal entries that Elizabeth's pretend play and clear affection for and interaction with her mother played a significant role in the reluctance of several specialists and her primary pediatrician to diagnose her with autism when she was first evaluated.  See, e.g., journal entries dated June 5, and September 17, 2004, Pet. Ex. 22 at 12-13; Dr. Bradshaw's July 12, 2004 visit note, Pet. Ex. 13, p. 22 ("We discussed [Elizabeth's] developmental delay and autism.  I do not think that Elizabeth has other diagnostic criteria at this time."); September 23, 2004 Psychological Evaluation, Pet. Ex. 5, p. 8 ("Elizabeth is currently not displaying a significant impairment in social interaction or in communication other than her expressive language usage.  No repetitive interests or motor mannerisms are reported. Therefore, she does not meet the criteria for a pervasive developmental disorder diagnosis.").

and playful. *Id*, pp. 2-3. She was diagnosed with vomiting and mild dehydration. *Id.*, p. 3.

c. Mrs. Mooney recorded this visit in her journal on August 11, 2003, noting that Elizabeth had picked up "a nasty bug" last week while visiting Santa Cruz. She noted that Elizabeth was 18 months old, and was beginning to "speak [her] mind" in protest. She described Elizabeth as "sweet almost all the time," smiling and giggling, and noted that she clapped her hands. However, she also commented that Elizabeth would fuss and make a high-pitched scream when in stores. Pet. Ex. 22 at 11.

d. Elizabeth's eighteen month well child visit occurred on September 18, 2003, after a seven day cruise to Alaska. No problems were noted and Elizabeth's growth and development were recorded as normal. In particular, she was noted to climb into adult chairs, walk well/rarely fall, follow directions, point to body parts, have at least 10-15 words, engage in imitative play, and use a spoon. Pet. Ex. 13, p. 23. The urine analysis was positive for protein and blood, and, given Elizabeth's prior urinary tract infection, a repeat sample was requested. *Id.* No concerns about Elizabeth's eye contact or interactions with her caregivers or environment were recorded. Mrs. Mooney's journal entry, dated September 2, 2003, reflected that Elizabeth was as "adorable as always" on the cruise that preceded this well child visit, and that she cooed and smiled on the trip, and appeared to enjoy watching the mountains and whales from the ship. Pet. Ex. 22 at 11; *see also* Pet. Ex. 23.2 at 31:11 to 33:15 (video taken during the August 2003 vacation).

e. Elizabeth continued to use new words during this period, as her mother's November 3, 2003 journal entry reflected that she had learned to say "up" and "down." Pet. Ex. 22 at 11. Whether this was true acquisition of words that Elizabeth continued to use was unclear, as a November 20, 2003 entry reflected that Elizabeth was "paying more attention" and was starting to "mimic" language more. *Id.* This last comment may reflect that Elizabeth's use of new words was echolalia,[33] a condition often seen in autistic children in which words spoken by others are repeated, but not used spontaneously or independently. Mrs. Mooney expressed her hope that Elizabeth might soon learn to "speak English," suggesting that her language skills were lagging. She noted that Elizabeth often became frustrated because she couldn't verbalize. *Id.* This was the last journal entry in the six month period after the June 5, 2003 vaccination.[34]

---

[33] DORLAND'S at 589.

[34] The next journal entry also reflected Elizabeth's frustration at being unable to communicate verbally. It was dated on March 9, 2004, more than three months after the previous entry. Pet. Ex. 22 at 12. The following entry, dated March 30, 2004, reflected Mrs. Mooney's first recorded concern that something was wrong with Elizabeth's behavior, based on her own internet research and concerns expressed by Elizabeth's babysitter. One of the concerning behaviors was Elizabeth's failure to follow commands. *Id.* at 12. This problem with receptive language is frequently observed in autistic children. *See Cedillo*, 2009 WL 331968 at *96-97.

f.  Elizabeth was seen on December 17, 2003 for rhinorrhea and persistent cough for two to three days.  According to Mrs. Mooney, Elizabeth's coughing had been occurring every few seconds, but was now decreased to every few minutes.  During the exam, Elizabeth was "playful [and] in no apparent distress."  She was diagnosed with an upper respiratory infection with persistent cough.  Pet. Ex. 13, p. 26.

3.  The videos during the six month period after June 5, 2003 reflect a toddler who enjoyed playing and taking in new surroundings, and one who smiled and reacted to the presence of others.  *See, e.g.*, Pet. Ex. 23.1 at 1:19:21 (reacting to cheers after taking her first unassisted steps on June 16, 2003), 1:20:51 (playing a toy piano with sister Faith on June 24, 2003), and 1:23:45 (trying to play with Faith's ball game on July 2, 2003; Pet. Ex. 23.2 at 31:50 (reacting to Mrs. Mooney joining Elizabeth and Mr. Mooney on deck on August 21, 2003) and 32:26 (responding to Mrs. Mooney's "baby talk" vocalizations on August 24, 2003).

## IV.  The Table Encephalopathy Claim.

A.  Requirements to Demonstrate a DTaP Table Encephalopathy.

1.  The Table.

To establish a Table encephalopathy following a DTaP vaccination, petitioners must demonstrate that Elizabeth developed an "encephalopathy" within 0-72 hours of her June 5, 2003 DTaP vaccination.  There are no issues concerning whether she received a DTaP vaccination on June 5, 2003.

2.  The Relevant QAI.

According to the QAI,[35] a vaccinee is considered to have suffered a Table encephalopathy if the vaccinee manifests an injury encompassed in the definition of an acute encephalopathy, within the appropriate time period, and if a chronic encephalopathy is present for more than 6 months after the immunization.  42 C.F.R. § 100.3(b)(2).

a.  Acute Encephalopathy.

An acute encephalopathy is "one that is sufficiently severe so as to require hospitalization (whether or not hospitalization occurred)."  § 100.3(b)(2)(i).  For a child younger than 18 months, presenting without an associated seizure event, an acute encephalopathy is indicated "by a significantly decreased level of consciousness . . .

---

[35] The QAI section of the Vaccine Injury Table, 42 C.F.R. § 100.3(b), contains definitions for the terms used in the Table.  *See Althen v. Sec'y, HHS*, 58 Fed. Cl. 270, 280 (2005), *aff'd*, 418 F.3d 1274 (Fed. Cir. 2005) (noting that the QAI should be used to interpret key terms found in the Table).

lasting for at least 24 hours." § 100.3(b)(2)(i)(A). A significantly decreased level of consciousness is indicated by the presence of one of three clinical signs for a period of at least 24 hours: "(1) Decreased or absent response to environment (responds, if at all, only to loud voice or painful stimuli); (2) Decreased or absent eye contact (does not fix gaze upon family members or other individuals); or (3) Inconsistent or absent responses to external stimuli (does not recognize familiar people or things)." § 100.3(b)(2)(i)(D). Sleepiness, irritability (fussiness), high-pitched and unusual screaming, persistent inconsolable crying, and bulging fontanelle are not, alone, or in combination, a demonstration of an acute encephalopathy. § 100.3(b)(2)(E).

### b. Chronic Encephalopathy.

A chronic encephalopathy is defined in the QAI as "a change in mental or neurologic status, first manifested during the applicable time period, [that] persists for a period of at least 6 months from the date of vaccination." § 100.3(b)(2)(ii). If a person returns to a typical neurologic state after suffering an acute encephalopathy, they are not presumed to have suffered residual neurologic damage and "any subsequent chronic encephalopathy shall not be presumed to be a sequela of the acute encephalopathy." *Id.*

## B. Petitioners' Claims.

In making the factual findings set forth in Section III.B. above, I rejected substantial portions of the joint affidavit and hearing testimony from petitioners. Their submissions and testimony often mirrored the QAI definitions discussed above. In this subsection, I set forth their view of the events in question and explain why I did not accept their accounts as accurate or as occurring at the times alleged. I also compare their testimony and affidavit to the Table requirements.

### 1. Petitioners' Contentions Regarding Initial Symptoms.

#### a. Petitioners' Joint Affidavit.

According to petitioners' affidavit, signed and filed in July, 2011 well over eight years after the events in questions, "[t]he day Elizabeth got the vaccines, she got [a] high fever, went to sleep, and would not wake up for 15 or 16 [hours]. When she did wake up, she would not look at her parents or speak." Pet. Ex. 1 at 2. Within seventy-two hours of her vaccinations, Elizabeth "became withdrawn, disinterested in her environment, unable or unwilling to look at her family members. She failed and refused to interact with her family members in a normal way, had a significantly diminished or absent response to her environment, had other unusual and inappropriate responses to her environment and showed general withdrawal." *Id.*

14

b. Petitioners' Testimony.

At the hearing, Elizabeth's parents provided similar descriptions of the events in the 72 hours after her June 5 vaccinations. Petitioners testified that between accompanying her mother on errands and the doctor visit that Thursday, Elizabeth was more tired than usual, so she was put to bed a little earlier than her usual bedtime of 8:00 pm. Tr. at 11, 88-89. The morning of Friday, June 6 began like any other morning, with petitioners having coffee and breakfast on their deck. Around 9:00 am, petitioners became concerned that Elizabeth was not awake yet, as she typically woke up between 7:00 and 8:00 am. Tr. at 11-12, 89. Mrs. Mooney went up to check on her, did a visual inspection, and saw that Elizabeth was still sleeping. Tr. at 12, 89. Petitioners assumed Elizabeth was not feeling well and needed extra sleep. Tr. at 12.

Around 10:00 am, both Mr. and Mrs. Mooney checked on Elizabeth, who was still asleep. Tr. at 12-13, 89. They pulled back her blankets and noticed that she was hot and sweaty.[36] Mrs. Mooney testified that she was very concerned and tried to wake Elizabeth up. Elizabeth usually would greet her mom in the morning by leaning against the crib's railing and lifting her arms up, anticipating being picked up.[37] However, when Mrs. Mooney tried to wake her, Elizabeth was "very groggy and unresponsive." Tr. at 13-14. Both parents recall Mrs. Mooney taking Elizabeth's temperature, but neither remembered the numerical temperature reading. Tr. at 13, 90, 104-105. Mrs. Mooney then called the pediatrician's office and was told to give Elizabeth some Tylenol and that the symptoms she was exhibiting were common reactions to vaccines. Tr. at 13, 90. Elizabeth slept again after being given Tylenol. Tr. at 13

When Elizabeth woke up for the second time[38] she seemed to be lethargic and not as energetic or alert as she usually was. According to Mr. Mooney, Elizabeth appeared to be in a daze and not completely conscious. Tr. at 97. She spent some of the afternoon being held by her parents on the couch, before being put to bed around her normal bedtime. Tr. at 13-14, 91, 106. According to Mrs. Mooney, Elizabeth acted like she didn't feel well. She did not "want to eat very much. She wasn't her normal self." Tr. at 15.

Mr. Mooney testified that he could not recall any specifics about Elizabeth's behavior on June 7 and June 8 (Tr. at 91), but also testified that he distinctively

---

[36] Mrs. Mooney described her as "very hot and sweaty," while Mr. Mooney conveyed she was "sweating a little bit" and "a little hot" and her cheeks were "a little red, redder than normal." Tr. at 13, 90.

[37] Video recorded on March 28, 2003 shows Elizabeth waking up from a nap in the manner described as typical by Mrs. Mooney. Pet. Ex. 23.1 at 1:03:46.

[38] Mrs. Mooney's testimony implied that Elizabeth woke up on her own, while Mr. Mooney testified that they had to wake her up. *See* Tr. at 13, 91.

15

remembered Elizabeth appearing "very different" in her high chair at dinner on one of those nights. Tr. at 107. She was sitting up in the highchair, not lolling around in it, but seemed different in the manner she was eating and reacting to her sister. *Id.* Mrs. Mooney noted that in the days immediately following the vaccinations, Elizabeth seemed like she felt unwell, was not very responsive, lacked good eye contact, and did not speak. Tr. at 15. Elizabeth also was very fussy and cried a lot. *Id.*

According to Mrs. Mooney's testimony, the time from Thursday night to Friday morning "was the most concerning strange change in her normal behavior." Tr. at 15. The rest of the weekend, she didn't seem like she felt well. She was not very responsive, didn't "give us very good eye contact and didn't speak at all." *Id.*

Mr. Mooney indicated that they initially thought Elizabeth was "fighting some type of . . . cold, flu, infection, some type of sickness," although he admitted that he did not pay too much attention to it. Tr. at 91. He stated that he does not remember anything specifically unusual about her behavior and agreed that if Elizabeth was acting abnormal it was not grossly abnormal. Tr. at 106-07.

2. Elizabeth's Behavior in the Ensuing Six Months.

a. Petitioners' Joint Affidavit.

Petitioners contend that Elizabeth's "significantly decreased level of consciousness" persisted for more than six months. Pet. Ex. 1 at 2-3. They further claim that "the withdrawal from her environment, external stimuli, and her family members has continued to the present date." *Id.* at 3.

b. Petitioners' Testimony.

With regard to Elizabeth's behavior after the weekend of June 7-8, 2003, Mrs. Mooney commented that "[w]hen a child gets sick usually they, within a couple of days, typically, they start to seem like them-theirselves again. [Elizabeth] never came back to what we had observed as being normal for her again. So when she got rid of the fever, she still continued to be unhappy and not give us good eye contact and not interact the normal way she had before with us and she seemed very detached from her environment." Tr. at 16. Specific claims of behavioral changes are addressed in more detail below.

(1) Social Interaction.

Mr. and Mrs. Mooney both testified that after the June 5, 2003 vaccinations, Elizabeth would not follow instructions or short commands, such as "come here," "sit down," or "bring the ball." *See* Tr. at 26, 97. They also reported that Elizabeth's eye contact changed. It was very difficult for them to get a reaction, such as when they tried getting her to look at a camera or smile for a photograph. Tr. at 26-28, 97. Petitioners

filed a series of photographs, many allegedly taken after the 15 month vaccinations,[39] reflecting Elizabeth looking away from the camera. Pet. Ex. 21; *see also* Tr. at 31-48, 94-96 (testimony regarding the photographs).

Petitioners also discussed a change in Elizabeth's play after the vaccinations. Prior to June 5, 2003, she enjoyed playing with dolls, her sister's dollhouse, trucks and other wheeled toys, and rolling around with the family dog. Tr. at 21, 26-28, 87. She also enjoyed climbing into people's laps, bath time, and playing pat-a-cake. *Id.* Elizabeth was very responsive to childhood television programs and showed "a lot of imaginary play and interaction with her sister and her sister's friends." Tr. at 21. According to petitioners, all of these activities and behaviors diminished or disappeared after her vaccinations. Tr. at 27-28, 92-94.

(2) Speech and Language Development.

Mrs. Mooney testified that Elizabeth spoke around 10 to 15 words and was slowly gaining new vocabulary prior to the June 5, 2003 vaccinations. Tr. at 8-9. After the vaccinations, Elizabeth did not speak at all for a while and when she began speaking again, would only rarely use new words. Tr. at 21.

(3) Constant Screaming and Crying.

Mrs. Mooney testified that, prior to receiving the June 2003 vaccinations, Elizabeth was a very easy-going, good-natured baby. Tr. at 16. She fussed and cried less than her siblings had. *Id.* After the vaccinations, Mrs. Mooney testified that they were unable to console or quiet Elizabeth. *Id.* Elizabeth's crying was not normal, standard child crying, but according to Mrs. Mooney was "high-pitched shrieking, deafening screaming" that "increased in intensity and increased in frequency to the point that, over the course of about a year, about a year from [June 5] she was screaming several hours per day with high, shrieking, screaming intensity. And by the time she was three or four it was many hours per day." Tr. 17-18.

Mr. Mooney also indicated that Elizabeth was previously very easygoing, and that after the vaccines she started to "scream and cry more often." Tr. at 92. He noted

---

[39] Most of the photographs include handwritten notes identifying what event or activity is depicted, and for some the date of the activity. It is not clear when the notes were written or who wrote the notes. *See* Tr. at 68-69. Since most of the photographs do not have a camera-generated date stamp, the handwritten notes and petitioners' testimony must be relied upon to determine when the photograph was taken. For at least one photograph it appears that the handwritten date is incorrect. Photograph 22 is labeled as "12 months old – Happy," and depicts Elizabeth in a highchair enjoying an ice cream cone. Pet. Ex. 21 at 22; *see also* Tr. at 38. However, according to petitioners' video recording, Elizabeth's first ice cream cone occurred on June 27, 2003, when she was 16 months of age. Pet. Ex. 23.1 at 1:21:20. Elizabeth is wearing the same dress in the photograph and video recording, making it likely that both images were captured on the same day.

that her screaming got worse over time.  Tr. at 93.  Petitioners tried various things, such as taking long drives with Elizabeth in the car, playing music, rocking her, and putting her in her swing, but according to Mrs. Mooney nothing seemed to soothe her.  Tr. at 16-17.  Mr. Mooney indicated that it was possible to console her, but it took a lot more time than before the vaccines to do so.  Tr. at 92.

(4)  Appetite and Weight Gain.

Mrs. Mooney explained that Elizabeth did not want to eat in the first few days after the vaccinations, but then her eating returned to its normal level.  Tr. at 20, 29.  However, after receiving the vaccines Elizabeth's growth and weight dropped to the 10 or 20th percentile and she did not gain weight as she had before.  Mrs. Mooney indicated that the pediatrician referred to this as a failure to thrive.  Tr. at 22, 57-58.

C.  Reasons for Rejecting Petitioners' Claims.

1.  The Initial Reaction Claims.

There were no videos submitted of Elizabeth's behavior and functioning in the first 72 hours following the June 5 DTaP vaccination, no reports in contemporaneous records,[40] no journal entries, and no histories that reflect the matters to which petitioners testified and set forth in their affidavit.  Even if the Vaccine Act did not preclude me from relying on petitioners' claims alone, "unsubstantiated by medical records or medical opinion," (*see* § 13(a)(1) ) there exist many other reasons for rejecting their testimony about the initial vaccine reaction.

Petitioners routinely scheduled appointments with Elizabeth's pediatrician when she was ill.  *See, e.g.*, Pet. Ex. 13, pp. 8, 26, 35-36.  They were willing to take her to an emergency room for treatment.  Pet. Ex. 20, pp. 2-3.  Therefore, the lack of any visit to a medical professional for nearly two months after her June 5, 2003 vaccinations is striking.[41]  If her symptoms and behavioral changes were as immediate and severe as petitioners allege they were,[42] I believe petitioners would have sought medical attention

---

[40] Petitioners allege they called Elizabeth's pediatrician in the week following her vaccinations (Tr. at 13, 90), but there is no notation of a phone call in the Auburn Bell Pediatrics records.  The records do include documentation of several phone calls between petitioners and Dr. Bradshaw that took place in January 2005.  *See* Pet. Ex. 17, p. 7.

[41] The first post vaccination medical record is from August 1, 2003, when petitioners took Elizabeth to the Dominican Hospital emergency room for vomiting.  Pet. Ex. 20, pp. 2-3; *see also* Journal, Pet. Ex. 22, at 11.  She did not return to her pediatrician until her eighteen month well child visit on September 18, 2003.

[42] I note that petitioners' allegations are not consistent.  For example, Mrs. Mooney testified that Elizabeth displayed an immediate reaction to the vaccines, with striking changes in her behavior and interaction with others.  Tr. at 27.  However, she also testified that after Elizabeth's initial fever resolved, she "slowly" started "showing less and less and less eye contact and response."  Tr. at 54.  Mrs. Mooney also testified

18

for their child. This reasoning is further buttressed by the entry in Elizabeth's records concerning a discussion about immunization reactions at the same visit in which the allegedly causal DTaP vaccination was administered.

Additionally, Mrs. Mooney appears to have recorded significant illnesses Elizabeth experienced in her journal. *See, e.g.* Pet. Ex. 13, pp. 38-40 and Pet. Ex. 22, at 8 (initial ER visit for high fever when seven months old); Pet. Ex. 13, p. 25 and Pet. Ex. 22, at 9 (ER visit for gastroenteritis). No such entry appears in the journal for the week following the allegedly causal vaccine. Although Mrs. Mooney attempted to explain why no entry was made, I did not credit this explanation, in the light of other entries recording negative events or behaviors.[43]

Because petitioners indicated that at least some of these behavior changes persisted after the initial reaction, I also considered the video and journal evidence regarding her behavior in the months that followed the vaccinations. As discussed in more detail below, these changes are not reflected in those exhibits. If they occurred at all, they are not present as persistent behaviors.

I therefore concluded that Elizabeth may have had a temporary, noticeable change in behavior, such as a fever and appearing more tired than usual, after she received her 15 month vaccinations, but I do not accept petitioners' accounts of the dramatic behavior changes after these vaccinations.

2. The Persisting Encephalopathy Claim.

There are sufficient observations and parental reports of milestones achieved in the contemporary records to make it difficult to accept petitioners' more recent assertions about Elizabeth's symptoms in the six months that followed the June vaccinations.[44] Furthermore, the medical histories provided during several

---

that "things went quickly downhill" when Elizabeth was around twenty months of age, and agreed that she "first became really concerned with development type of things" in March 2004. Tr. at 61, 66-67.

[43] Mrs. Mooney testified that the changes are not described in detail in the journal because she wanted to keep the entries upbeat and positive and therefore did not describe how "bad things really were." Tr. at 49, 66. *But see* Pet. Ex. 22 at 4 (3/13/02 entry noting Elizabeth had been "puking a few times a day for the past few days"), 8 (9/6/02 entry reporting that Elizabeth had started to cry a lot), and 10 (3/26/03 entry documenting Elizabeth's possible bladder infection and 5/8/03 entry noting that Elizabeth was fussing, screaming a lot and having bad separation anxiety).

[44] Although I accept Mrs. Mooney's testimony (Tr. at 70) that the ER physician did not spend much time with Elizabeth during the August 1, 2003 visit, the records from the visit reflect that Elizabeth was happy, smiling, and singing at one point, and in tears, but easily consolable, awake, alert, talking, and playful at another point. Pet. Ex. 20, pp. 2-3. Doctor Bradshaw's records from the six month period following the allegedly causal vaccine do not mention any abnormal behavior or lack of responsiveness. Even if I were to accept petitioners' assertion that Dr. Bradshaw did not document the concerns they raised (*see* Tr. at 57, 70-71), I would still find insufficient support for their contentions concerning Elizabeth's behavior. The

developmental evaluations,[45] as well as updates conveyed to her pediatrician[46] in 2004, do not support petitioners' contentions.[47] Mrs. Mooney testified that the evaluators did not accurately record the medical histories they provided. Tr. at 60-62. While medical records may contain errors,[48] given the complete lack of any documentation of symptoms consistent with petitioners' contentions and the consistency of the information that is contained in the records, I find that petitioners are simply mistaken in their recollections concerning when Elizabeth displayed the behaviors they now contend started following her June 2003 vaccinations.

The medical records chronicle a relatively typical gradual onset of symptoms concerning to parents and caregivers, followed by parents raising their concerns to a primary care provider, and ultimately referrals to specialists. A sudden loss of skills or abrupt change in behavior would have triggered action in parents who took their child to the doctor for sniffles and coughs. I note that once Mrs. Mooney found internet references that suggested Elizabeth might be autistic, she took Elizabeth to her primary care provider and sought referrals to specialists. Although Elizabeth's autism diagnosis was delayed because she did not display sufficient social impairments required for the diagnosis, the concerning behaviors were reported and recorded. Had they actually arisen in closer proximity to the vaccinations in June 2003, I am confident that her parents would have reported them.

---

video recordings establish that any behavior changes did not reach the level of impairment required under the statute to establish a chronic encephalopathy.

[45] Elizabeth saw two different providers for speech and language evaluations in August 2004. Pet. Exs. 3 (Placer Speech & Hearing Services) and 4 (The Speech Works). She was seen by a staff psychologist at the Alta California Regional Center in September 2004. Pet. Ex. 5. In October and November 2004, Elizabeth was seen by personnel at the University of California, Davis M.I.N.D. Institute, Early Developmental Studies Laboratory. Pet. Exs. 6-7. Additionally, in the fall of 2004, she underwent a multi-visit occupational therapy evaluation. Pet. Ex. 8.

[46] In addition to her 2 year well child visit, Elizabeth went to the pediatrician in 2004 to discuss the findings of the developmental evaluations and a sick visit for congestion and allergic reaction to amoxicillin. Pet. Ex. 13, pp. 5, 8-9, 20, 22-23, 25, 47-54.

[47] For example, petitioners routinely reported that their concerns about Elizabeth's speech arose between October and December 2003 (when she was 20 to 22 months). *See, e.g.,* Pet. Exs. 3, p. 1; 4, p. 1; and 5, p. 2. Additionally, providers did not diagnose Elizabeth with autism until late 2004 because although she had speech and language delay she did not display significant symptoms associated with the other diagnostic criteria for autism. Pet. Exs. 5, pp.2-8; 13, p. 22; *see White v. Sec'y, HHS,* No. 04-337V, 2011 WL 6176064 at *4-9 (Fed. Cl. Spec. Mstr. Nov. 22, 2011) (discussing the diagnostic criteria for autism spectrum disorders). Thirdly, although some of the evaluators reference Elizabeth screaming, it was typically associated with change in activities and not a continuous or constant behavior. Pet. Exs. 3, p. 1; 5, p. 4; 7, pp. 1-2.

[48] *See, e.g.,* Pet. Ex. 11, p. 84; *see also* Tr. at 80 (discussing inaccurate reference to Elizabeth's 18 month vaccinations instead of to her 16 month vaccinations).

Once again, I emphasize that I do not think petitioners are deliberately misleading this court. I am quite willing to accept that Elizabeth has displayed the behaviors described, but not that these behaviors occurred at the time claimed, or that, at least initially, they were of the intensity and severity described. Rather, they have conflated the time frame for the concerning behaviors displayed at 20-24 months of age with the post-vaccinal period. A good example of this conflation is testimony about Elizabeth losing weight and dropping off the growth curve shortly after the vaccinations. The failure to thrive diagnosis was actually recorded before Elizabeth's first birthday. Pet. Ex. 13, pp. 24 (growth chart), 60 (computer records showing Failure to Thrive diagnosis on September 18, 2002).

Petitioners' allegations that Elizabeth continued to have a lack of eye contact, poor social interaction, and a decreased or absent response to her environment are thoroughly refuted by the video records alone.[49] However, Mrs. Mooney's own journal also casts substantial doubt on their testimony that these behaviors began in close temporal relationship to the June 5, 2003 vaccinations.[50]

I acknowledge that in some video clips Elizabeth is crying and unhappy or does not react or respond to the person filming. However, given the various instances on the recordings where she is not displaying the alleged changes and instead is engaged with others and reacting to her environment[51] it is clear that she did not experience a chronic encephalopathy following her June 5, 2003 DTaP vaccination. *See* § 100.3 (b)(2)(ii) ("Individuals who return to a normal neurologic state after the acute encephalopathy shall not be presumed to have suffered residual neurologic damage from that event.").

---

[49] Petitioners did not play any of the video records at the hearing. Instead, Mrs. Mooney walked the court through the 43 photographs filed as petitioners' exhibit 21. Tr. at 31-48; *see also* Tr. at 94-96 (testimony of Mr. Mooney regarding photographs 26-29 and 36-37). A significant portion of her testimony was devoted to noting how the photographs demonstrate Elizabeth's lost of eye contact. The use of photographs to illustrate the presence or lack of eye contact is generally problematic because photographs do not capture what was going on outside the narrow focus of the camera lens. Photographs do not convey if there was a loud sound that may have caused a person to turn to the left, thus looking away from the camera at the moment the photo was taken. For example, based solely on photograph 15 one could conclude that Elizabeth's older sister, Faith, has reduced eye contact because in the photograph Elizabeth is looking directly at the camera and Faith is not. Pet. Ex. 21 at 15. On the other hand, videotapes are very helpful in establishing when certain behaviors arose, including reduced eye contact, because they enable the viewer to see and hear what was occurring at the moment the behavior or activity was captured on film.

[50] Mrs. Mooney wrote seven journal entries in the six months following Elizabeth's June 5, 2003 vaccinations. Pet. Ex. 22 at 10-12. None describe the severe change in behaviors that petitioners contend occurred. *See supra* at pp. 11-12.

[51] *See supra* at p. 13. I note there are also recordings from 2004 where Elizabeth is seen interacting with others and demonstrating normal behaviors. S*ee, e.g,* Pet. Ex. 23.2 at 47:00 (hosting an imaginary tea party on March 18, 2004), 51:58 (playing with musical toy on March 25, 2004), 41:39 (sharing crayons and coloring with Faith on February 19, 2004), 53:19 (interacting with pet dog on April 8, 2004), and 1:10:30 (playing with Noah's Ark toy on September 17, 2004).

## V. Conclusion and Orders to the Parties.

The evidence fails to establish that Elizabeth suffered from an acute encephalopathy within 72 hours of her June 5, 2003 DTaP vaccination. Assuming, *arguendo*, that she did have an acute encephalopathy, there is insufficient evidence to demonstrate that Elizabeth exhibited symptoms of a chronic encephalopathy for the six months following her DTaP vaccine, and ample evidence that she did not.

A review of Elizabeth's medical records from the six month period as well as histories and other information included in later records are not consistent with a chronic encephalopathy. The photographs filed by petitioners offer little in terms of support for their allegation of a Table encephalopathy, and while journals can be of assistance in supporting some petitioner's claims, Mrs. Mooney's journal does not provide significant support for petitioners in this case. The video recordings provide the strongest evidence that Elizabeth did not suffer from a Table encephalopathy following her June 5, 2003 vaccinations.

**In light of the findings made herein, by no later than <u>Friday, August 2, 2013</u>, petitioners shall show cause why this case should not be dismissed for failure to establish entitlement to compensation.**

**IT IS SO ORDERED.**

<u>s/Denise K. Vowell</u>
Denise K. Vowell
Special Master

22